[Civ. No. 16675. First Dist., Div. Two. Dec. 5, 1956.]

ARA PENNINGTON et al., Appellants, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Respondents.

*Assigned by Chairman of Judicial Council.

Edward J. Niland and Boccardo, Blum, Lull & Niland for Appellants.

Rankin, Oneal, Luckhardt, Center & Hall, Michael di Leonardo and Bronson, Bronson & McKinnon for Respondents.

KAUFMAN, J.—Plaintiffs appeal from a judgment in favor of defendants in a wrongful death action. Plaintiffs are the widow and five minor children of Santford Pennington, who was killed on August 25, 1952, when the truck which he was operating was struck by respondent Southern Pacific Company's train on the Fair Oaks Avenue railroad crossing in Sunnyvale. The railroad company and two of its employees were charged in the complaint with negligence in the management and operation of the train, and the company was charged with maintaining its crossing in a dangerous and defective condition in that the crossing protection was inadequate, the crossing was obstructed, and that the physical character of the crossing rendered it hazardous and unsafe. The other respondent, herein, Schuckl and Company, which operated a canning company near the Fair Oaks Avenue crossing was charged with having negligently caused this crossing to be dangerous and unsafe by piling boxes and installing certain appurtenances and structures, and by causing great noise in the vicinity of the crossing.

All defendants denied negligence and alleged contributory negligence on the part of plaintiff's decedent. Lester J. Weese, a defendant, the fireman on respondent's train, filed a cross-complaint for his injuries received in the crash, against respondent Schuckl and Company and against Disposal Service, Inc., the employer of decedent Pennington. He alleged that the cannery had so negligently operated its property as to obstruct the crossing rendering its physical character dangerous, defective and unsafe, and also charged negligence in the operation of the truck of decedent's employer.

The jury returned a verdict against plaintiffs and in favor of defendants Southern Pacific Company and Schuckl and Company, and a verdict in favor of cross-complainant Weese against Disposal Service, Inc. and Schuckl and Company. The action against the individual defendants, J. R. Johnston and Lester Weese, the engineer and fireman, were dismissed by plaintiffs.

The accident occurred at about 8:20 p. m., daylight saving time, when Santford Pennington, an employee of Disposal

Service, Inc., was hauling a load of waste material from Schuckl and Company's plant. Fair Oaks Avenue is a paved street running north and south. The railroad tracks run east and west, and there are six parallel sets of tracks at this crossing. The tracks were numbered from south to north on the map used at trial. Track 4 is the main line track, east bound, while track 5 is the main line westbound track. Tracks 1 and 2 are spur tracks; 3 and 6 are drill tracks. The main line tracks run straight for a distance of 548 feet east of the crossing, then curve to the north. Schuckl and Company operates its cannery adjacent to the railroad tracks just south of the crossing. The main building is on the west side of Fair Oaks Avenue, and on the east side is a shed and box yard. An overhead conveyor extends above and across the street about 15 feet south of track number 1.

The crossing is protected by Griswold type crossing signals erected at the northwest and southeast corners. These signals consist of two illuminated crossarms, an illuminated stop sign the size of an ordinary boulevard stop sign, a bell, and two red lights 8 inches in diameter. When activated the stop sign swings down to face traffic, the bell rings, and the red lights flash alternately. These signals were set to operate automatically whenever a westbound train reached a point 3,000 feet east of the San Jose side of the crossing, and operate continuously until the train had passed to the San Francisco side of the crossing. The two crossing signals are separately wired and operate independently. Power is supplied from the P. G. and E. power lines, and in case of power failure from storage batteries. If all current failed, a weight would be released causing the stop sign to swing into place, but respondent's engineer was not certain whether or not the lights and bell would function in the last situation. There was testimony that respondent railroad had checked the signals on the morning of August 25, 1952, the day of the accident, and that they were then functioning properly. Three hours after the accident they were checked and found to be in proper working order. They were checked at a point near the crossing, and not at the point 3,000 feet distant, where they would be first activated by a train. However, there was testimony that another train coming from the north which passed later on the evening of the accident, activated the signals.

Respondent's fireman Weese and engineer Johnston, as well as a train passenger Lambert, and James, a truckdriver,

all positively testified that the crossing signals were working just before the accident. A truckdriver, Williams, testified that he had stopped his truck on the north or opposite side of the crossing and was walking toward the cannery restaurant when he heard the bells start to ring and heard the train whistle. Both crossing signals were operating. He saw Pennington's truck approaching under the conveyor. It proceeded onto the tracks at about eight miles per hour. He saw it collide with the train. It had stopped at no time while he was watching it. He first saw the train about 500 feet distant. He heard only two whistles from the train, and then for the first time observed the truck approaching.

The truck driver James, who was loading boxes at Schuckl and Company, saw Pennington's truck drive diagonally across the road and start toward the crossing going very slowly. At about that time the south crossing signal began to operate. After the signal began working and he saw the truck approaching, he heard the train whistle, and saw the train at the corner of the pile of boxes. He heard the crash of the collision. He had not continued to watch the truck from the time he had observed it near the crossing. He had heard the crossing bell before the sound of the train whistle. All of these observations occurred within a few seconds, possibly 30, he said.

The fireman Weese stated that he was riding on the left hand side of the cab as the train rounded the curve between 200 and 300 yards east of the crossing, at a speed of between 60 and 65 miles per hour. It was dark. The train in accordance with company rules sounded its whistle one mile from the crossing, then again at about one thousand feet from the crossing. He saw the truck at track number 2 when the engine rounded the curve onto the straight track. There were boxes piled up just south of the right of way to the east of the crossing. Every time he had been on this run, he had seen the boxes piled up in that area to the height shown in a photographic exhibit. The boxes obstructed his view of the crossing, hence he was able to see only the cab of the truck at first. He could tell, however, that the crossing signal was blinking when the engine was 300 feet away, although the boxes obstructed his view of the signal itself. Weese yelled to the engineer when he saw the truck. The emergency brakes were applied at about 175 feet from the crossing, but since it takes two or three seconds for them to

take hold, there could have been not more than a slight reduction in momentum before the truck was hit. Weese suffered a loss of memory for a day or two after the accident, but his memory later returned and he could recall details preceding the accident.

The engineer testified that his train, consisting of an older type engine with stationary headlight, baggage cars and three coaches was traveling at 65 miles per hour, that he did not see the truck at any time prior to the collision. He was 175 feet from the crossing when the fireman yelled the warning and he applied the brakes. He stated that the whistle blast for this crossing is not a mile away, but about 1,400 feet east of the crossing, that the company rules require the blowing of the whistle at this point, and that he did so; that he blew one series of whistles, not two, and that the whistle was still blowing when the collision took place. The train bell had been in automatic operation ever since the train had left Santa Clara. There was no time to give the series of short whistle blasts required by company rules when persons or motor vehicles are on the tracks.

Three former employees of Schuckl and Company were called by appellants under section 2055, Code of Civil Procedure. Lopez, who was outside the building, saw Pennington's truck when it was about 50 feet from the crossing, moving at about ten miles per hour. It came to a full stop, he said, underneath the overhead conveyor, where it remained for a few seconds. The crossing signal on the south side was not then operating. He heard no bell, saw no flashing lights. He did not see the truck start up again, but heard the collision. He heard no train whistle, although previously he had heard train whistles even when working inside the building.

Roy Lingerfelt testified that he was engaged in taking boxes off the conveyor when he paused to light a cigarette. He saw Pennington's truck drive up and stop by the south side signal. He saw the driver turn his head toward the right. The truck stopped for a couple of seconds, and started up in low gear. The crossing signal was not then in operation. He did not continue to watch the truck but a few seconds later saw the train 75 feet from the crossing. Although he had heard train whistles on prior occasions, he heard none prior to the accident, nor did he hear the train bell.

Gerald Wilson, a lift truck operator, was working about 50 feet south of the crossing. He saw Pennington's truck

come to a full stop under the conveyor. The crossing signal was not then operating. He did not see the truck start up again, but heard the crash. Between the time he saw the truck and heard the crash, he heard no train whistle, although on other occasions when in this area he had heard whistles of approaching trains.

Lingerfelt and Wilson had given statements to a railroad company investigator shortly after the accident. They were in the investigator's handwriting but were signed by the above witnesses. Although they denied having read the statements before signing them, there was expert handwriting testimony to the effect that the answer "yes" to the question "Have you read the above three-page statement and is it true to the best of your knowledge and belief?" was in the witness' handwriting. Many of the statements in the investigator's report contradicted the testimony given by these witnesses at the trial. Police Officer Jones also testified that Wilson on the evening of the accident told him that the signals had been working, that he heard the train approaching, and saw Pennington drive onto the track and get hit.

Jack Rissner, testifying on behalf of Schuckl and Company, said that he did not hear the train approaching, but heard the impact. He did not hear the train whistle. Although a statement signed by him declared that he had said that the crossing signals were in operation after the accident, he explained that he was then referring to the fact that they operated when a later train passed from the west that night.

The train passenger Lambert stated that he observed the crossing signals working as the train approached the crossing, that he could see the signal when 700 feet from the crossing. During the last quarter mile he heard the whistle blowing and the bell ringing.

There was testimony that for some time prior to the accident boxes were piled to a considerable height on the Schuckl property adjoining the railroad right of way. They were piled to a height of 14 feet at the time of the accident. An official of Schuckl testified that employees were ordered not to pile the boxes near the crossing signals, but he had made no objection to piling them two pallets high (or 14 feet) near the spur track.

Mrs. Pennington testified that decedent's right eye had been injured at one time, and his sight damaged in that eye. His application for a chauffeur's license stated "Right eye blind 1½ years." She said that he could see light and motion

with the right eye, but not objects. The vision in his left eye was perfectly normal. The license issued in April, 1952, was unrestricted.

Appellants contend that reversible error was committed by the trial court in refusing to instruct that the railroad company's compliance with statutory regulations constituted only the minimum of care required, and did not necessarily relieve it of an obligation to take additional precautions.

The court instructed that the Public Utilities Code requires a bell of a certain type or a steam whistle to be sounded at a distance of 1,320 feet from a railroad crossing, and to be kept sounding until the train has passed the crossing, and that "the railroad may, if it so desires, go beyond the terms of the statute, and cause both the bell be rung and the whistle to be blown." The jury was also instructed that the Public Utilities Commission has the exclusive power to determine and prescribe the protection to be installed at each crossing by a railroad, and that there was no evidence that said Commission had prescribed any warning device for the Fair Oaks Avenue crossing other than the Griswold signals which were installed at said crossing at the time of the accident; that the evidence was uncontradicted that said Commission had ordered the installation of these signals. Other instructions told the jury that the absence of a flagman or guard, or the failure in operation of a mechanical warning device does not absolve a person going upon the track area from the duty of exercising ordinary care in looking and listening for the approach of a train; that the maintenance of such flagman or signaling device is, however, an invitation to rely upon its efficient operation, and if one gives attention to such device, he is not required to use the same amount of caution as if no such warning device were provided. They were told further that it was the railroad's duty to exercise reasonable care in keeping such device in good repair, but that to charge a railroad with negligence, the company must have had actual notice of the defective condition, or if it did not have such notice, such lack of notice must be due to its failure to exercise reasonable care.

Appellants herein offered several instructions in regard to a railway's compliance with statutory requirements, all of which were refused.

An instruction was given at plaintiff's request stating that whether or not a given rate of speed in the absence of a statute or otherwise, is or is not negligence, depends upon

the circumstances and the place where the train is being operated, and that it was an issue for the jury whether or not the speed of the train in this case constituted negligence as a matter of fact. Respondent railway company contends that this and other instructions given sufficiently apprised the jury of the duties of the company and the standards of care applicable thereto, and that appellant cannot complain of the failure to give specific instructions if the subject matter is adequately covered by other instructions, citing *Lloyd* v. *Southern Pac. Co.*, 111 Cal.App.2d 626 [245 P.2d 583].

We cannot agree that the instruction on speed referred to above, nor any of the other instructions reviewed by respondent, gave any indication to the jury that the standards imposed by statute are minimum standards only. ▮ It is well settled that such statutory regulations constitute only the minimum measure of care required by the railroad, and it is usually a matter for the jury to determine whether something more than the minimum was required under the evidence in the case. (*Peri* v. *Los Angeles Junction Ry. Co.*, 22 Cal.2d 111 [137 P.2d 441]; *Bush* v. *Southern Pac. Co.*, 106 Cal.App. 101, 106 [289 P. 190]; *Lloyd* v. *Southern Pac. Co.*, 111 Cal.App.2d 626, 638 [245 P.2d 583]; *Jensen* v. *Southern Pac. Co.*, 129 Cal.App.2d 67, 72 [276 P.2d 703].)

▮ The fact that the jury was told that the railroad might use either the bell or whistle under the Public Utilities Code requirements, but need not do both, but might go beyond the terms of the statute if it wished, would give the impression that the railroad had fully performed its duty to warn in this manner if it followed the code, and that anything beyond this was a matter of choice but not of duty. Just prior to this they had been told that the Public Utilities Commission had the exclusive right to determine crossing protection, and that respondent railway had installed the type of protection ordered. In *Lloyd* v. *Southern Pac. Co., supra,* the appellant railway complained of the giving of an instruction which advised the jury that the fact that the railroad was not required by law to provide safety devices in addition to those which it had provided, did not relieve the railroad of its obligations to exercise reasonable care for the safety of travelers, "and if an ordinarily prudent person, in the exercise of ordinary care, would have supplied additional warning and safety devices over those that were present at the time, then in those circumstances Southern Pacific Company would be required to furnish such warning and

safety devices.'' It would seem that an instruction should have been given in this case pointing out that the statutory requirements and the orders of the Public Utilities Commission were minimum requirements, for under the instructions given the jury could well have concluded that full compliance with such standards discharged the duty of reasonable care in all matters concerned with signals and crossing protection. Being informed that the Public Utilities Commission had exclusive power to determine what crossing protection was necessary, the jury would not realize that they could decide that something in addition to the prescribed protection might be required to meet the standard of reasonable care under the circumstances existing at this crossing. There was evidence from which it might be inferred that the obstructed view of the tracks from this crossing was a condition existing for such length of time that the railroad had notice thereof, or in the exercise of reasonable care should have had such notice. The jury could have considered whether the statutory signals required to be first sounded at 1,320 feet from such a crossing were sufficient in view of speeds scheduled at 65 miles per hour or approximately 95 feet per second, giving approximately 14 seconds warning, in an industrial area where slow moving trucks are making constant use of the crossing. It appears that at least one of appellants' instructions on this subject should have been given and that the denial thereof was prejudicial error.

Appellant charges that error was committed in instructing in terms of a rigid duty on the part of decedent to stop, look, listen and alight. The instructions given were B.A.J.I. 203-A and 203-B and 203-C reading as follows:

''If the view of the tracks is obstructed, then greater caution is required in approaching them.

''If the obstruction is such that one cannot obtain, without stopping, a reasonably assuring view of the tracks in both directions before entering the dangerous track area, then ordinarily it is his duty to stop, look in both directions, and listen for the approach of train, engine, or car, and if necessary, to alight from his vehicle, go forward a few steps and take advantage of the view thus afforded.

''Neither the absence of a flagman, guard or other person who might have been stationed at a railroad crossing to give warning of approaching trains, nor a failure of duty on the part of any such person, nor a failure in operation of a mechanical device placed at a crossing to signal warning, ab-

solves a person going upon a track area, such as that involved in this case, from the duty to exercise ordinary care for his own protection, and to that end, looking and listening for the approach of a train.''

Respondents maintain that when the foregoing instructions are considered together with the instruction given immediately thereafter, the second paragraph of B.A.J.I. Number 203-C, it is clear that no absolute standard of conduct was made applicable to decedent. That instruction is as follows:

''However, the maintenance by a railroad company of a flagman, warning bell, or other signaling device, at a railroad crossing is an invitation to a traveler approaching the crossing, to rely upon the efficient operation of the warning system. One who exercises ordinary care in giving attention to such a warning system, and who relies upon the operation of the same, is not required to use the same amount of caution in looking and listening for an approaching train as is required when no method of warning is provided, or when one does not exercise ordinary care in making use of the protective system that is provided.''

There can be no question but that the ''guarded crossing'' cases are in a class by themselves, and that the ''stop, look and listen'' rule which the older cases applied to the unguarded crossing was early held not to be necessarily the standard of care required at the guarded crossing. (See *Koch* v. *Southern Calif. Ry. Co.*, 148 Cal. 677 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas. 795, 4 L.R.A.N.S. 521] ; *Gregg* v. *Western Pac. R. R. Co.*, 193 Cal. 212 [223 P. 553] ; *Ogburn* v. *Atchison, etc. Ry. Co.*, 110 Cal.App. 587 [294 P. 491].) It has been held that the quantum of care is somewhat less at the guarded crossing than at the unguarded, and the amount of care is that of the man of ordinary prudence under the circumstances. (*Peri* v. *Los Angeles Junction Ry. Co.*, 22 Cal.2d 111, 120 [137 P.2d 441] ; *Toschi* v. *Christian*, 24 Cal.2d 354, 360 [149 P.2d 848].) ▮ Furthermore, it now appears to be the rule that at an obstructed crossing there is no absolute duty to stop, but such duty exists only in cases where a reasonably prudent man in the exercise of ordinary care would have considered a stop to be necessary. *Green* v. *Key System Transit Lines*, 116 Cal.App.2d 512 [253 P.2d 780] an unguarded obstructed crossing case in which a hearing was denied by the Supreme Court to appellant railway company, assumed that the stricter rule of the earlier cases had been so modified. The

question must therefore be left to the jury as to whether a stop would be necessary under the circumstances.

In view of the fact that the instruction on the guarded crossing followed the first two quoted instructions, and since this was without question a guarded crossing, we do not think the jury was misled as to the standard to be applied. If deceased acted in reliance upon the automatic crossing signals, then the standard of the guarded crossing was to be applied. If the driver instead of relying for protection upon the automatic signals, relied instead wholly upon his own precautions, then the standards outlined in the first two instructions would be applicable. (See *Ogburn* v. *Atchison etc. Ry. Co.*, 110 Cal.App. 587, 595 [294 P. 491].) The jury was not instructed in terms of an absolute duty to stop, look, listen and alight, but were told that this standard was applicable only in cases where it was not possible to otherwise obtain an assuring view of the tracks.

Appellants themselves offered an instruction which made reference to the "stop, look, listen and alight" rule, but introduced it with a statement that "It is not necessary in every case . . . that one about to cross a railroad track should stop, look and listen." It went on to point out that whether one stopped, looked or listened might have a bearing on the question of whether or not due care was exercised. This was undoubtedly a better phrased instruction in view of the later cases, but we think the instruction given, in the light of the instructions as a whole, did not mislead the jury.

There was undisputed evidence that Santford Pennington suffered from impaired vision in the right eye, although he had been issued an unrestricted chauffeur's license since the impairment. The trial court gave the following instruction of which appellants complain:

"If you find from the evidence that at the time and place of the accident in question the operator of the truck, Santford Pennington, was handicapped by the loss of sight of one eye, then in consequence, he was obligated to make such extraordinary use of his unimpaired senses as would reasonably compensate for his handicap to normal vision.

"Failure to make such extraordinary use of his unimpaired senses would constitute negligence upon the part of Santford Pennington."

In 65 Corpus Juris Secundum 996, it is said that the fact that a person has defective vision *may* make it incumbent on him to make greater use of his other senses to prevent in-

jury, than if he were in full possession of the faculty of sight. Ordinary care, however, is all that is required of him. A case cited in support of this rule is *Jones* v. *Bayley,* 49 Cal.App.2d 647, 654 [122 P.2d 293], where it was said that a handicapped person *may* be required to make a more alert use of other faculties to reach the standard of ordinary care. The correct rule stated in that case is that a person with impaired faculties is bound to "use that care which a person of ordinary prudence with faculties so impaired would use in the same circumstances." The instruction herein flatly stated that Pennington was obligated, without making any reference to the existing circumstances, to make an extraordinary use of his other senses to compensate for his handicap. Under the circumstances of this case, an ordinary use of the sense of hearing together with normal vision in one eye might well have been sufficient use of his faculties to meet the standard of ordinary care in detecting the railroad's signals. The fireman, who no doubt had the use of two eyes, recovered against Schuckl and Company because his view of the truck on the crossing was obstructed by the boxes on that defendant's property. A person with two eyes in Pennington's position with his view of the tracks obstructed, would not be required to make an extraordinary use of his sense of hearing and yet Pennington is thus penalized by this instruction. Whatever extra effort Pennington might be required to make under the circumstances here existing would be whatever effort would bring him to the standard of ordinary care and not necessarily to the standard of compensating for normal vision. His conduct "must be reasonable in the light of his knowledge of his infirmity." (Prosser on Torts, 2d ed., p. 126.)

 The trial court instructed on section 670, subdivision (a), of the Vehicle Code concerned with the adequacy of brakes to bring a vehicle to a stop within certain distances. He then instructed that the stopping distance for a speed 10 miles per hour was 9.3 feet and for 15 miles per hour, 22.8 feet, concluding as follows: "There are other provisions in that section of the Code, but they are not relevant to the testimony in the case." There was no evidence that Pennington attempted to apply the brakes from the time he had started from the vicinity of the conveyor, proceeding at a speed estimated variously at between 58 and less than 20 miles per hour. There is no evidence in the record as to the condition of the brakes. The instruction was erroneously given. (*Ketchum* v. *Pattee,* 37 Cal.App.2d 122, 129 [98 P.2d 1051].)

Instructions may mislead the jury when they find no support in the evidence. (*Rodenberger* v. *Frederickson*, 111 Cal. App.2d 139, 142 [244 P.2d 107].) It has been held that the above instruction is error, but not reversible error if it has not misled the jury to the prejudice of appellant. (*Nelson* v. *Porterville Union H. Sch. Dist.*, 117 Cal.App.2d 96 [254 P.2d 945]; *Trelut* v. *Kazarian*, 110 Cal.App.2d 506 [243 P.2d 104].) In the present case, however, it can hardly be said, that the jury would be inclined to dismiss the instruction as inapplicable when they had been told by the trial court that the portion of the code section which he had read was relevant to the testimony in the case and he singled out speeds within the range of decedent's estimated speed.

Appellants complain of the giving of an instruction concerning the testimony of one witness worthy of belief being sufficient for the proof of any fact and justifying a verdict in accordance with such testimony, even if a number of witnesses have testified to the contrary "if from the whole case, considering the credibility of witnesses and after weighing the various factors of evidence, you should believe that there is a balance of probability pointing to the accuracy and honesty of one witness." This instruction, B.A.J.I. Number 25, is based on Code of Civil Procedure, section 1844. However, the language "and would justify a verdict in accordance with such testimony has been criticized as faulty but held not to be prejudicial." (*Long* v. *Standard Oil Co.*, 92 Cal.App.2d 455 [207 P.2d 837]; *People* v. *Kirkes*, 39 Cal. 2d 719 [249 P.2d 1]; *Rideau* v. *Los Angeles Transit Lines*, 124 Cal.App.2d 466, 470 [268 P.2d 772]; *Barton* v. *Messmore*, 122 Cal.App.2d 813, 816 [265 P.2d 949, 38 A.L.R.2d 138].) We do not think that the instruction was prejudicial in view of the preceding instruction which told the jury that the final test was not in the relative number of witnesses, "but in the relative convincing force of the evidence."

We do not believe that prejudicial error was committed in refusing appellant's instruction on the effect of negative evidence, although it might well have been given in a case where appellant's case against one defendant was based to a large extent upon the charge that certain signals were not given. Respondents say that the form of the instruction was erroneous because it singled out only the fireman and engineer as giving positive testimony. While the instruction refers first to the positive testimony of these two crew members as to the ringing of the bell or blowing of the whistle, the instruc-

tion then states that the negative testimony may be weighed "against the positive testimony of the train crew members and *others.*" (Emphasis ours.) But under all the instructions given the jury must have understood that testimony of a witness in a position to hear, that he heard no whistle, was equivalent to evidence that no whistle was blown.

In view of the above prejudicial errors committed in instructing the jury, the judgment in favor of respondent Southern Pacific Company must be reversed.

■ However, as to the respondent Schuckl, the evidence shows without contradiction, that while the piles of boxes obstructed the view of the tracks, they did not interfere with the railroad's crossing signals. Any structure necessary in the carrying on of the canning company's business would to some extent obstruct the view of the tracks. As respondent points out, their building on the other side of Fair Oaks Avenue also obstructs the view of the tracks. Section 371 of the Restatement of Torts states the rule as follows: "A possessor of land is subject to liability for bodily harm to others outside the land caused by an activity carried on by him thereon which he realizes or should realize as involving an unreasonable risk of bodily harm to them under the same conditions as though the activity were carried on at a neutral place." Comment (b) points out that the public interest in a possessor's free use of his land may be a factor in determining whether the risk is reasonable or unreasonable. The illustration is given of a high wall being built by the possessor of land at the intersection of two heavily traveled streets. The possessor is said not to be liable for an accident caused by the fact that the wall prevents motorists from seeing other motorists approaching the intersection along the other road. Since the evidence shows that obstruction was caused by a reasonable use of respondent's property with which the deceased was familiar, for at the time of the accident he was engaged in hauling waste material from respondents' plant, there was no violation on the part of Schuckl and Company of any duty owed to decedent. The judgment must therefore be affirmed as to respondent Schuckl and Company.

Judgment reversed as to respondent Southern Pacific Company.

Judgment affirmed as to respondent Schuckl and Company.

Draper, J. pro tem.,* concurred.

---

*Assigned by Chairman of Judicial Council.

DOOLING, Acting P. J.—I concur in the judgment. I cannot concur in the approval, even tacit, of that portion of the stop, look and listen instruction which requires the plaintiff "if necessary, to alight from his vehicle, go forward a few steps and take advantage of the view thus afforded." Despite the fact that Mr. Justice Holmes by his dictum in *Baltimore & O. R. R. Co.* v. *Goodman,* 275 U.S. 66 [48 S.Ct. 24, 72 L.Ed. 167, 56 A.L.R. 645], gave an impetus to this doctrine which apparently carried our supreme court with it in *Koster* v. *Southern Pac. Co.,* 207 Cal. 753, 762 [279 P. 788], I had thought that the repudiation of this dictum of Holmes in 1934 by a unanimous court in *Pokora* v. *Wabash Ry. Co.,* 292 U.S. 98 [54 S.Ct. 580, 78 L.Ed. 1149, 91 A.L.R. 1049], had turned the tide in this state against what is a patently unrealistic and frequently ridiculous requirement. The same view of the later California decisions was taken by the United States Circuit Court in *Southern Pac. Co.* v. *Souza,* 179 F.2d 691, 693; and in *Green* v. *Key System Transit Lines,* 116 Cal.App.2d 512, 516 [253 P.2d 780], the other division of this court characterized the rule of the Goodman case as "the rather unrealistic doctrine of 'stop, look and listen' . . . evolved by Mr. Justice Holmes," stating that since the announcement of that doctrine "the law as to the duty of a vehicle driver . . . has undergone considerable change." Many of the later California cases are collected in the Souza and Green cases and I consider it unnecessary to do more than refer to those citations.

The absurdity of the rigid rule requiring the driver to get out of his vehicle in every case where he cannot otherwise get a clear view of the tracks was so clearly stated by Mr. Justice Cardozo in the Pokora case, 292 U.S. at pages 104-105 that I content myself with a quotation:

"Standards of prudent conduct are declared at times by courts, but they are taken over from the facts of life. To get out of a vehicle and reconnoitre is an uncommon precaution, as everyday experience informs us. Besides being uncommon, it is very likely to be futile, and sometimes even dangerous. If the driver leaves his vehicle when he nears a cut or curve, he will learn nothing by getting out about the perils that lurk beyond. By the time he regains his seat and sets his car in motion, the hidden train may be upon him. [Citing cases.] Often the added safeguard will be dubious though the track happens to be straight, as it seems that this one was, at all events as far as the station,

about five blocks to the north. A train traveling at a speed of 30 miles an hour will cover a quarter of a mile in the space of thirty seconds. It may thus emerge out of obscurity as the driver turns his back to regain the waiting car, and may then descend upon him suddenly when his car is on the track. Instead of helping himself by getting out, he might do better to press forward with all his faculties alert. So a train at a neighboring station, apparently at rest and harmless, may be transformed in a few seconds into an instrument of destruction.''

The further criticism found in the note in 56 A.L.R. at page 654 is equally cogent:

''In most situations, however, the driver of a car, unaccompanied, considering the advisability of leaving his car and going to a point from which he can get an unobstructed view of the track, is as likely, in the exercise of reasonable care, to decide against that course as in favor of it, for the reason that from his point of view there is as great a possibility, if he does adopt that course, that he may be struck by a train which comes in sight after he turns his back to return to his car, as there is that, if he does not adopt that course, he may be struck by a train which he would have seen if he had left his car and gone to the track. Save in exceptional situations above referred to, it would seem that the logical application of the doctrine would require the driver, as soon as he returns to his car, to go back again to the track, or to the point from which he could get an unobstructed view, and repeat the process indefinitely until assured that there would be no other trains.''

I am convinced that the time is long overdue for the California courts to repudiate in express terms this ridiculous refinement of the so-called stop, look and listen rule.