[Civ. No. 19593. First Dist., Div. Two. Oct. 2, 1962.]

MĀRY JO MARTINDALE et al., Plaintiffs and Appellants, v. CITY OF MOUNTAIN VIEW et al., Defendants and Respondents.

110

J. A. London and William G. Filice for Plaintiffs and Appellants.

Hoge, Fenton, Jones & Appel, Edwin D. Jones, Jr., Rodney R. Atchison, City Attorney, Alexander, Bacon & Mundhenk, Herbert Chamberlin, Rankin, Oneal, Luckhardt & Center and William A. Ingram for Defendants and Respondents.

AGEE, J.—This is a wrongful death action brought by the widow and minor children of the decedent, who was killed when he drove a pickup truck over a railroad crossing and was struck by a train. Decedent's brother is a coplaintiff, seeking damages for the truck.

The defendants are the City of Mountain View, within whose confines the crossing is located, the Southern Pacific Company and the engineer who was operating its train, and Wilder & Jones, a corporation, the general contractor on sewer construction work for the city.

The appeal is from a judgment entered upon a unanimous jury verdict in favor of all defendants, returned in less than one hour after a 12-day trial.

The accident happened on Saturday, January 12, 1957, about 10:20 o'clock a. m. Rengstorff Avenue runs north and south and is intersected by two sets of railroad tracks, running east and west. Decedent was alone and proceeding north on Rengstorff. As he reached the northerly track, a westbound train collided with the right side of the pickup.

The railroad right of way is 90 feet wide. Vehicles northbound on Rengstorff would have to traverse a distance of 40½ feet from the southerly boundary line of the right of way before reaching the southerly rail of the westbound track. The tracks run stright for a mile and a half to the east of the crossing. The width of the crossing is 24 feet and the paved portion thereof is 22 feet wide.

The crossing was protected by two automatic signals, one on each side of the tracks. Each consisted of a standard to which was attached a pair of alternately flashing red lights, a 12-inch circular gong, and the familiar "crossbuck" railroad crossing signs. Each light faced front and back and enabled an approaching vehicle operator to see the pair of red lights to his right, plus another pair to the left on the opposite side of the tracks. An actuating mechanism operated the lights and gongs whenever a train reached a point 3,300 feet from the crossing. All of the testimony was to the effect that these

signal lights and gongs were in proper operation at the time in question.

The train's locomotive was equipped with a "Mars gyro" rotating headlight and two fixed beam headlights, a 60-pound bell and an air horn. All three headlights on the front of the locomotive were burning as the train approached, and the bell attached to the locomotive was in continuous operation.

The city had let a contract to defendant Wilder & Jones which included the installation of a sewer pipe line along the center of Rengstorff. This required the boring of a hole under the railroad tracks in order to insert steel casing pipes into which the sewer pipe itself was to be inserted. It was necessary to dig a hole or a pit in the center of Rengstorff to the south of the tracks in order to get the boring machinery down into a position to do the boring. The pit was dug on January 3 and part of January 4. It extended in a north-south direction for a distance of approximately 32 feet, was from 5 to 7 feet in width, and 10 to 12 feet in depth. The end nearer the tracks was approximately even with the southerly property line of the right of way. The various witnesses gave various estimates of the distance from this end of the pit to the nearest rail, ranging from 18 to 41 feet, but photographs introduced into evidence by both sides show that the pit ended at or very near the southerly line of the right of way.

The boring subcontractor commenced work on Friday, January 4, and started pushing pipe under the tracks on the following day. This work was completed on Tuesday, January 8, and the boring equipment was removed the following morning. Defendant Wilder & Jones then constructed a temporary bulkhead at the northerly end of the pit to prevent a cave-in and to protect traffic southbound on Rengstorff. This consisted of five 2-inch by 12-inch planks placed side by side in a vertical position. These planks covered the entire width of the pit at that point. They extended up from the bottom of the pit to various heights above the ground level. The most westerly plank extended 7 feet, 4 inches above the pavement, the next three 4 feet, 5 inches, and the most easterly 3 feet, 6 inches.

There were also barriers placed at both sides and the southerly end of the excavation. These were 3 feet, 7 inches in height. Because the work was being done from the easterly side of the excavation, there was a "detour" sign at the southerly side, directing northbound traffic to proceed to the left of the excavation. There was no work being done on the day

of the accident, which was a Saturday, and the right or easterly side was clear and of sufficient width to permit its use by northbound traffic intending to cross over the tracks. The only witness who claimed to have seen which side decedent used testified that it was the right side.

Decedent was familiar with the crossing and the construction work in progress. A business owned by himself and his brother was located nearby. The crossing was on the route between such business and the church of which he was the minister. In fact, at the time of the accident, decedent was en route from the business to the church. The general contractor's foreman had seen him pass by several times before the accident. On one occasion, he stopped and asked the foreman if he could get some of the excess dirt to use as fill on the church premises. The decedent also had rented a lot on Rengstorff to the general contractor to use for parking equipment.

Decedent's speed as he crossed over the eastbound track and headed toward the track on which the train was coming was testified to be approximately 10 miles per hour. He never stopped. The truck was struck broadside by the front of the train and carried down the track for a considerable distance.

*Theory of Plaintiffs' Case.* Plaintiffs state, in their closing brief: ''Plaintiffs' theory in the case was that the defendants [city, railroad and contractor] were negligent in permitting a dangerous and defective condition to exist, in that the crossing was too narrow [22 feet] and when coupled with the construction work became more dangerous. Further, that the defendants had knowledge of these facts and permitted the dangerous condition to exist without taking greater safety precautions.''

In their opening brief, plaintiffs also state: ''One of plaintiffs' theories was that Reverend Martindale's pickup went off the roadway due to the narrow crossing, and that *he became locked on the tracks.*'' (Emphasis ours.)

There is absolutely no evidence which would support such a theory. The testimony of the eyewitnesses was that the truck was in motion at all times up to the actual impact and this testimony is uncontradicted. The investigating police officer testified that the point of impact was approximately in the center of the intersection. He stated that he determined this from lateral skid marks, paint scrapings and debris from the truck and by indentures in the right of way crossing. He marked the location of these on the engineer's diagram used at the trial. Plaintiffs' counsel then called the officer's

attention to the following notation in his report: "Point of impact was determined by large indentures found on the railroad ties. . . ." It was pointed out by plaintiffs' counsel that the ties at the crossing were covered over by the pavement and could not have been indented by the impact. The officer explained that he was referring to the planks which run lengthwise beside the rails over the crossing and not to the cross-ties beneath. These planks are approximately level with the top of the rails and the adjacent pavement. The one on the outside of the rail is, in railroad terminology, called the "runner plank" and the one on the inside, the "gauge plank."

It is apparent that plaintiffs' counsel hoped to develop an argument that the indentures on the "ties" could only refer to cross-ties and, since the cross-ties at the crossing were covered with 6 or 7 inches of asphalt, the point of impact would therefore be "off the roadway." This being so, it would then be argued that the "pickup went off the roadway due to the narrow crossing" and "became locked on the tracks."

While it is true that plaintiffs called the officer as an adverse witness, he being an employee of the city, his testimony stands uncontradicted and is corroborated by the only eyewitness who fixed the point of impact. The theory of "going off the roadway" is completely without support in the record, and a verdict in accord therewith would be based upon nothing more than pure speculation.

*Points Raised on Appeal*

*Prior accidents.* A Mrs. Barry testified that on January 3, 1957, about 5:30 o'clock p. m., she was driving her automobile south on Rengstorff and, as she approached the tracks, she observed the construction work that had been done on the other side; that "it wasn't real dark" at the time. Plaintiffs' counsel then offered to prove by her testimony that "she couldn't determine whether to proceed to her left or to her right, that she became engaged in the rails, that as a result of that she injured her back"; that she notified the Mountain View Police Department of the incident that same evening. Objections to this offer of proof were sustained.

An offer of proof was then made as to what a Mrs. McKinnon would testify, and objections thereto were also sustained. The offer is by no means clear but the following statement is made in plaintiffs' opening brief: "Counsel for plaintiffs further offered that on January 8, 1957, just four days before the fatal accident, Mrs. McKinnon, in driving across the intersection

went off the roadway, got her wheels locked in the rails and got stuck''; that she called the city and wrote to the railroad, advising them of her experience.

■ Evidence of prior accidents occurring under substantially the same general circumstances as the accident in question is admissible to prove the existence of a dangerous condition as well as that defendant had notice or knowledge thereof. ■ It is not necessary that the prior accidents be shown to have occurred in precisely the same manner. It is sufficient if they occurred under substantially similar circumstances. (*Dragash* v. *Western Pac. R.R. Co.*, 161 Cal.App.2d 233, 242 [326 P.2d 649]; *Gilbert* v. *Pessin Grocery Co.*, 132 Cal.App.2d 212, 217 [282 P.2d 148]; Witkin, California Evidence (1958) § 144, p. 165.)

■ The basic rule is stated in *Laird* v. *T. W. Mather, Inc.*, 51 Cal.2d 210, 220 [331 P.2d 617] : ''Before evidence of previous injuries may be admitted on the issue of whether or not the condition as it existed was in fact a dangerous one, it must first be shown that the conditions under which the alleged previous accidents occurred were the same or substantially similar to the one in question.'' [Citations.] ■ The question of admissibility is primarily one for the trial court and is confined to its sound discretion. (*Dragash* v. *Western Pac. R.R. Co., supra*, p. 242.) ■ In the opinion of the trial court, the accidents of Mrs. Barry and Mrs. McKinnon were not similar to that of the decedent. We agree.

Decedent's accident was on a quiet Saturday forenoon. All construction work had been suspended for the weekend. The easterly or right side of Rengstorff was clear. All equipment and spoil dirt had been removed therefrom. There was no moving traffic in the vicinity. The sky was overcast but the weather was dry. Decedent's speed as he traversed the crossing was about 10 miles per hour. Gongs on the light standards were ringing and the red lights were flashing. The train's bell was in continuous operation and its three headlights were on. No confusion was caused by the construction work. There was no activity of any kind around it. Decedent had become very familiar with its existence and location. The truck did not at any time go off the pavement. There was no causal connection between the width of the pavement and decedent's accident.

Mrs. Barry and Mrs. McKinnon both approached the tracks from the north and were proceeding south. Each entered Rengstorff from Alma Street which runs parallel with the tracks and is 20 feet north of the right of way. Thus each was on

Rengstorff for a distance of only 20 feet before reaching the right of way. Each saw the construction work and the barriers on the opposite side of the right of way and became confused. Each was faced with the problem of crossing over the two sets of tracks and then passing by the barriers in order to continue south on Rengstorff. There were men working around the pit when Mrs. McKinnon came along. There were also rock and dirt at the easterly side of the pit. She was going 25 miles per hour and there was other traffic crossing at the time. Mrs. Barry came along when it was dark or almost dark. One or more wheels of each automobile ran off the edge of the pavement on the westerly side.

The gist of this offered testimony is that each woman, under the circumstances confronting her, became so confused that her automobile was caused to run ''off the roadway.'' We do not find any error in the trial court's ruling that these accidents were not sufficiently similar to comply with the ''basic rule,'' as quoted above from the *Laird* case, *supra*.

However, *Laird* goes on to state, at page 220: ''The strictness of this requirement of similarity of conditions is 'much relaxed,' however, when the purpose of the offered evidence is to show notice, 'since all that is required here is that the previous injury should be such as to attract the defendant's attention to the dangerous situation which resulted in the litigated accident.' '' (Quoting from McCormick, Evidence § 352.)

In the instant case, the city and the railroad stipulated to knowledge of the physical conditions existing at the time of the accident. The court repeated this stipulation in its instructions to the jury. There was no disagreement about what these conditions were. Numerous photographs were introduced by both sides. Some of these were taken within minutes after the accident. The question as to what the physical conditions were and as to whether the city and the railroad had knowledge thereof was never in dispute. The same is true as to the general contractor, who created the conditions caused by the construction work and who must necessarily have had knowledge of the physical condition of the crossing under which he was installing the sewer pipe.

It is true that the defendants did not stipulate that these conditions made the crossing dangerous or hazardous for motorists exercising reasonable care for their own safety. The court instructed the jury, after stating the stipulation, as

follows: "Whether or not these conditions constituted a dangerous, defective and hazardous condition in the respects charged, and was a proximate cause of the accident is a question of fact for the jury to decide."

Plaintiffs complain that the city's stipulation did not include an admission that it had such knowledge for a sufficient time to remedy the condition (Gov. Code, § 53051) but the city inspector testified to daily inspection and express knowledge of the construction from the beginning. The width of the crossing, the location of the tracks, the signals and warning signs had been the same for many years. While it is true that section 53051 applies to defendant city only, the fact that the jury did not impose liability upon either of the other two defendants indicates that the "time to remedy" provision was not the basis of the jury's verdict in favor of the city.

*Notice to the city and railroad that crossing should be widened.* Plaintiffs made an offer to prove by certain communications, in addition to those made by Mrs. Barry and Mrs. McKinnon, that defendants were put "on notice of the existence of a dangerous and defective condition at the crossing." They state: "Plaintiffs have contended throughout that the stipulation made by the defendants City and Southern Pacific were [*sic*] not broad enough to exclude the offered evidence. Had they stipulated they had knowledge of the dangerous or defective condition rather than knowledge of the conditions that existed, perhaps the evidence could be properly excluded."

The plaintiffs' offer of proof is stated in their brief, as follows: "In addition to the prior accidents [of Mrs. Barry and Mrs. McKinnon], plaintiffs offered to prove that the Public Utilities Commission (PUC) recommended that the crossing be widened; that the Southern Pacific advised the PUC that it would widen the crossing; that the Society of Locomotive Engineers recommended to both the Southern Pacific and PUC that the crossing be widened; that the city recommended the crossing be widened; that the PUC conducted surveys in 1948 and 1951 with respect to the Rengstorff crossing and that it recommended the crossing be widened and that other improvements be made; that the Chief of Police of Mountain View forwarded documents to the City Manager pointing out that traffic inventories had been taken of the crossing and that cars had become locked in the rails because it was too narrow; that there was an inter-office communication between the City Manager and the City Engi-

neer on December 13, 1956, requesting more width for the Rengstorff crossing.''

The foregoing recommendations were that the pavement be increased from the existing width of 22 feet to a width of 24 feet, except that the city recommended an increase to 28 feet.

As before stated, there is absolutely no evidence that the width of the pavement at the crossing had any relevancy to the accident involved herein and therefore the trial court did not commit error in excluding the offered evidence.

▇ *Other crossings.* There is no doubt that evidence as to the conditions existing at similar crossings in the same general area may be admissible if a showing is made as to similarity and relevancy. But here there was no such showing as to either. Counsel for plaintiffs says that he tried to lay a foundation for such evidence by asking certain questions of the city's chief of police, to which questions objections were sustained. The record is as follows: ''Q. [of the Chief] Now, in comparison with the other crossings in the City of Mountain View, would you say that the traffic over this crossing is greater, lesser, about the same, as other crossings in this area? . . . [Objection sustained.] Q. Now, you are familiar with all the other crossings in the City of Mountain View? A. Yes. Q. And you are familiar with the amount of traffic that goes over all of the crossings? A. Not precisely. Q. Rough idea? A. It would be an estimate. Q. I see. Now, would you say that the Rengstorff crossing is the same or similar to these other crossings? . . . [Objection sustained.] Q. Are you familiar with the Castro Street crossing? A. I am. Q. Would you state that the amount of traffic that traverses the Rengstorff crossing is substantially the same as the amount of traffic that crosses the Castro Street crossing? . . . [Objection sustained.] ''

Immediately before resting his case, plaintiffs' counsel made an extended offer of proof, covering five pages of the reporter's transcript, and no reference whatsoever was made therein as to any other crossings.

Plaintiffs' counsel says that he desisted from making a record on this point because the trial court had admonished him that the subject should not be inquired into. Assuming this to be so, although the record fails to disclose it, counsel did not so restrain himself as to any other points in his offer of proof referred to above. ▇ As stated in *Jensen* v. *Southern Pac. Co.,* 129 Cal.App.2d 67, 74 [276 P.2d 703]: ''Determination of relevancy, including similarity of condi-

tions in such a case [other crossings], is primarily a function of the trial judge.'' There is no basis for disturbing his decision in the instant case.

 *Demonstration of signal by use of model.* Defendant railroad maintained an electrically operated signal at the crossing which was automatically activated when a westbound train was 3,300 feet east of the crossing. The speed of the train was 68 miles per hour. This would mean that the warning bell starting ringing 32 seconds before the train reached the crossing. A model of the signal was brought into the courtroom and activated for a period of 32 seconds. Plaintiffs complain that a distorted impression was created because the model was cleaner than the one at the crossing and the sound of the bell was louder when emitted within the confines of the courtroom. This was admitted to be so on the *voir dire* examination of the witness who explained the working of the signal and qualified the model as an exact replica thereof, except for the height of the standard, which had to be lowered in order to get it into the courtroom.

The admission of such evidence rests within the sound discretion of the trial court. (Code Civ. Proc., § 1954.) In a recent case, involving the same type of accident, it was held that such discretion was not abused by the allowance of an identical demonstration. (*Greeneich* v. *Southern Pac. Co.*, 189 Cal.App.2d 100, 108-109 [11 Cal.Rptr. 235].) The cited case is so directly in point that we do not feel that further citations involving the use of models in the courtroom are necessary.

 *Evidence of widow's "wealth."* On direct examination, the widow testified that decedent's annual salary as a full-time minister was $3,900 and that in the year prior to the accident he had received $12,954 from the trailer sales business owned by him and his brother, which the latter managed and to which decedent devoted very little time or attention. She also testified as to the current expenses of herself and children. This was over three years after her husband's death and the expenses, which included new car payments, special schools, and music lessons, totaled a substantial amount. The question was thus presented, under the issue as to the extent of damages sustained by plaintiffs, whether decedent would have had the financial capacity to meet these expenses if he had lived. This led to an inquiry on cross-examination concerning the trailer business. It developed that the widow had continued to receive the same share of profits therefrom that her husband had been receiving prior to his death. The

business was later incorporated and the widow became one of its officers. When asked if she received a salary as such, her counsel for the first time objected to this line of questioning. The objection was overruled and the answer was in the affirmative. The amount of the salary was not asked. It was also developed, without objection, that the widow was herself an ordained minister and that she had taken her husband's place as minister for a period of 16 months after his death at the same salary. She also stated that she had an interest in an implement business in Idaho and a venture referred to as "Max Craft," both being handled by decedent's brother. There is nothing in the record to indicate that either had any value. She testified: "I think it [implement business] went in the hole. If you will look on my records that you have I am sure you will find that it went kind of sad last year, and also the Max Craft too."

The prejudice claimed to have been suffered by the foregoing testimony is that the jury "could very well conclude that she [the widow] was not entitled to [any] compensation." The verdict, however, was against *all* plaintiffs, including the minor children and the decedent's brother, who was seeking a recovery for damages to the truck. Also, no recovery was allowed for the funeral expenses, as to the amount of which there was no dispute. It is evident that the jury's verdict was based upon a finding of nonliability of the defendants and not on the basis that the widow's "wealth" precluded any recovery whatsoever.

It seems clear that, in the instant case, such a claim of prejudice would only become relevant if the verdict had been in favor of plaintiffs and they then contended that the *amount* of the award was improperly affected by the testimony discussed above.

We see no need to discuss the further answers of the defendants that the cross-examination was within the scope of the direct examination, that timely objection was not made, that no motion was made to strike any of the testimony, and that the jury was fully and correctly instructed as to measure and elements of damages.

*The instructions criticized.* The court instructed the jury in the language of BAJI 203, as follows: "The tracks of a railroad, such as that involved in this case, are in themselves a warning of danger. Before a person drives a vehicle into the space which would be occupied by a train if it were to pass over such tracks, it is his duty to use every reasonable oppor-

tunity to look and listen for the approach of train, engine or car on the tracks, and to yield the right-of-way to any approaching train, engine or car so near as to constitute an immediate hazard. What is included in the term 'every reasonable opportunity' depends on all the surrounding circumstances, as they would be met and viewed by a person of ordinary prudence, if he occupied the same position as the one whose conduct is in question. No failure of duty or of the customary practice on the part of those in charge of a train or of anyone handling or supervising any phase of its operation, such as a failure to sound the bell, siren or whistle when required absolves a person going upon a track area, such as that involved in this case, from the duty to use ordinary care for his own protection." There is no criticism of this instruction.

The instruction which followed is the one criticized. The trial court followed substantially the wording of the first part of BAJI 203-B. In order to more clearly state the point, we quote BAJI 203-B in its entirety: "If the obstruction is such that one cannot obtain, without stopping, a reasonably assuring view of the tracks in both directions before entering the dangerous track area, then ordinarily it is his duty to stop, look and listen for the approach of train, engine or car, *and if necessary, to alight from his vehicle, go forward a few steps and take advantage of the view thus afforded.*" (Emphasis added.)

The above italicized portion was eliminated from the instruction given, which is as follows: "If the obstruction is such that one cannot obtain, without stopping, a reasonably assuring view of the tracks in both directions before entering the dangerous track area, then ordinarily it is his duty to look and listen for the approach of train, engine or car and stop if necessary and not proceed on to the dangerous track area without taking such precautions as a reasonably prudent motorist would take under the then existing circumstances."

This instruction, as given, eliminates the vice denounced by Mr. Justice Dooling in *Pennington* v. *Southern Pac. Co.,* 146 Cal.App.2d 605 [304 P.2d 22], in which he states, in concurring with the result reached by the majority of the court on other grounds, at page 620: "I cannot concur in the approval, even tacit, of that portion of the stop, look and listen instruction which requires the plaintiff 'if necessary, to alight from his vehicle, go forward a few steps and take advantage of the view thus afforded.' "

In *Anello* v. *Southern Pac. Co.,* 174 Cal.App.2d 317 [344 P.2d 843], BAJI 203-B was given in full and this was held to constitute reversible error. In a later case, *Essick* v. *Union Pac. R.R. Co.,* 182 Cal.App.2d 456 [6 Cal.Rptr. 208], the giving of the same instruction was held to be error but not to require a reversal.

It is not necessary to prolong the discussion of this point because, in the words of Mr. Justice Dooling in *Pennington, supra,* page 621, "this ridiculous refinement [i.e., alighting] of the so-called stop, look and listen rule" was eliminated from the instruction given. Such instruction, as given, did not inform the jury that the decedent had an absolute duty to stop, but that such duty existed only if the obstruction to his view was such that he could not obtain a reasonably assuring view of the tracks without doing so. The instruction did not impose a duty to alight from his vehicle and go forward on foot if such a view could not be obtained.

The court also instructed the jury in the terms of BAJI 151 regarding the duty of care imposed on the driver of any vehicle. Plaintiff contends that the court erred in giving the last portion of that instruction because the record reveals no evidence to support the instruction. This portion of the instruction required that the decedent "keep the vehicle under such control that, to avoid a collision with any person or with any other object, he can stop as quickly as might be required of him by eventualities that would be anticipated by an ordinarily prudent driver in a like position."

Plaintiffs' contention appears to rest on the fact that the only witnesses who saw decedent's vehicle testified that it was moving slowly. In the instant case, much of the jury's decision necessarily rested on inference rather than upon direct evidence of the facts in issue. The single most significant fact was that the decedent's vehicle failed to stop before reaching the tracks at a time when the crossing signals were operating. From this fact, considered in the context of the surrounding circumstances, it is reasonably inferable that the decedent did not have such control of his vehicle as would behoove a reasonably prudent man in like circumstances. In *Lutz* v. *Schendel* (1959) 175 Cal.App.2d 140 [345 P.2d 488], the court specifically recognized the duty of the driver of a vehicle as set out in the quoted instruction and applied the rule in a case involving vehicles which were admittedly proceeding at a slow rate of speed. No other evidence of lack of control was apparent. Plaintiffs' contention is without merit.

*Was expert opinion admissible on whether the condition at the crossing constituted a hazard to motorists?* Plaintiffs called a safety engineer as a witness and propounded a hypothetical question to him which called for an opinion as to whether or not the condition at the crossing was hazardous to motorists attempting to cross the tracks. Defendants' objection was sustained. Plaintiffs incorrectly state that the "point has never been before a California Court."

In *Wilkerson* v. *City of El Monte,* 17 Cal.App.2d 615 [62 P.2d 790], the almost identical question was propounded to two expert witnesses, both of whom answered that the intersection involved therein was, in their opinion, dangerous and unsafe. The court held: "The opinions went to the ultimate question of fact to be determined by the jury." (P. 621.) The judgment for plaintiff was reversed. To the same effect are: *Hogan* v. *Miller,* 153 Cal.App.2d 107, 116 [314 P.2d 230]; *Baccus* v. *Kroger,* 120 Cal.App.2d 802, 803-804 [262 P.2d 349].

We recognize that expert opinion is not inadmissible merely because it coincides with an ultimate issue of fact. The question is one which must be determined under the particular circumstances of each case and the answer rests largely in the discretion of the trial court. We find no abuse of such discretion in the instant case.

In conclusion, we wish to state that we are mindful of the difference between the functions of a trial court and an appellate court in considering the facts. In this case, however, the evidence as to negligence on the part of the decedent proximately causing or proximately contributing to cause the accident in question is so overwhelming that the alleged errors complained of by appellants, if we are incorrect in holding that none occurred, could not in our opinion have resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.)

Judgment affirmed.

Kaufman, P. J., and Shoemaker, J., concurred.

A petition for a rehearing was denied October 18, 1962, and appellants' petition for a hearing by the Supreme Court was denied November 28, 1962.