[Civ. No. 9857.   Third Dist.   Feb. 14, 1961.]

ANITA GREENEICH, a Minor, etc., et al., Appellants, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

Johnson & Parker and Smith & Zeller for Appellants.

Richard B. Daley for Respondent.

SCHOTTKY, J. — Anita Greeneich, Irving Greeneich, minors, by and through their guardian *ad litem,* Carl Moberg, and Hannah M. Greeneich, by and through her guardian *ad litem,* Carl Moberg, appeal from an adverse judgment in an action brought to recover for the death of Edwin A. Greeneich.

In arguing for a reversal of the judgment appellants made a number of contentions, but before discussing these we shall briefly summarize the evidence as shown by the record.

The accident in which Edwin A. Greeneich was killed occurred between 11 p. m. and midnight December 8, 1957, at the intersection of Ash Street and the Southern Pacific railroad tracks near French Camp. Ash Street runs east and west and as the crossing is approached in an easterly direction the street turns approximately 30 degrees to the left. The tracks run north and south and there are three sets of rails. On the west side of the tracks are a reflectorized railroad crossing sign, a railroad crossing sign painted on the road surface, and a standard railroad cross-buck sign. Ten feet in advance of the first track are double white lines. On the east side of the crossing there is a wigwag signal, with a light and bell, located on the north side of the intersection.

The night of the accident the decedent left his home to go to his job. On the way his automobile stalled some 50 feet east of the crossing. He apparently left his car and proceeded to Kelley's Corner, a bar located on the west side of the tracks. At Kelley's Corner the decedent met James Vales who offered either to drive him to town or give him a hand with his car. The decedent had never met Vales before and had no knowledge that Vales' eyesight was poor. The driver's license of Vales was restricted to driving with glasses, but he was not wearing them at the time because he had broken them the previous day. Vales and the decedent entered Vales' car. Vales drove from Kelley's Corner to the tracks. He was unfamiliar with the crossing and did not know that the road curved. The tracks were approximately 4 feet above the general grade of the street. Vales testified that he did not see anything coming when he started across the railroad tracks nor did he see the signal operating. He also testified that he did not hear any train whistle; that he hit either a high rail or a rough place in the road and a tire blew out; that he then ascertained that the train was approaching; that he discovered the car was off the paved portion of the road and he could not get back on the road; that once he found he could not get back on the road he tried to get across the railroad tracks; that he never heard a whistle or a bell; and that the headlamp on the train remained white at all times. The train consisted of two power units and 100 cars, was approximately 5,100 feet in length and traveling north on the easternmost track at a speed of about 40 miles per hour. The fireman, who was the first person to observe the car, was seated on the left-hand side of the cab of the engine, which was the side toward the automobile. The fireman testified that he first observed the automobile in

the reflection of the oscillating headlamp when the engine was some 1,250 feet from the crossing, at which time it was just west of the first set of tracks. He continued to watch the car and noticed it seemed to be bouncing and asked the engineer if the vehicle was going to make it. The engineer denied hearing this remark. A few seconds later the fireman observed the car come to a complete stop on the third set of tracks and asked the engineer if the car was "foul." The train was about 10 car lengths, or 500 feet, from the crossing at that time. The engineer testified that at the time the car "lit" in front of him he heard something about a car. He was blowing the whistle at the time. The automobile was about 500 feet in front of the engine when he applied the air to the brakes. The train stopped some 700 feet past the point of impact. A highway patrol officer in his accident report reported that "[t]he engineer states that he saw the car crossing the tracks and bouncing, then come to a halt with the rear near the railroad tracks, blew the whistle, saw the car was not going to get off the tracks so he set the brakes of the train. . . ."

Paul Fegley, the District Engineer for the Westinghouse Air Brake Company, testified that under the circumstances it would take 1,460 feet to stop the train traveling at 40 miles an hour. Other facts will appear during the course of the opinion.

Appellants' first contention is that the evidence is not sufficient to sustain the verdict in favor of respondent railroad company. We are unable to agree with this contention. ▄ The well-settled rule is as expressed in *Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, at page 429 [45 P.2d 183] : "In reviewing the evidence on such an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. ▄ It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ▄ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court."

Appellants make an able and earnest argument in an effort to prove their contention that the record does not sustain the judgment. If the verdict of the jury had been in favor of

appellants, their argument would be very helpful in pointing out evidence in support of such verdict; but in view of the adverse verdict of the jury, the testimony pointed out and relied upon by appellants merely accentuates the conflict in the testimony. It was within the province of the jury to weigh the evidence and resolve the conflict. Therefore we deem it unnecessary to discuss at length the argument of appellants as to the insufficiency of the evidence.

Our study of the record convinces us that the question of whether or not the accident was proximately caused by the negligence of the train crew was one of fact for the jury. The fireman first observed the automobile when the train was at the whistle post some 1,250 feet away but did not notice the automobile bouncing on the tracks until the train was 1,000 feet from the crossing, at which time he made the first statement to the engineer. The jury could find that the train crew was not negligent in not acting before this time. And since the automobile continued across the tracks until the engine was 500 feet from the crossing, at which time the vehicle came to a complete stop, the jury could find that until the car came to a complete stop the train crew could believe the car would make it across the tracks and that the failure to apply the air to the brakes when the car was first observed bouncing on the tracks was not negligence. Since there was evidence in the record from which the jury could find that there was no indication that the automobile in which the decedent was riding would not clear the tracks before the train arrived until the vehicle came to a complete stop, the evidence is sufficient to sustain the verdict of the jury in favor of the respondent railroad.

Appellants next contend that the trial court committed prejudicial error in permitting respondent to introduce into evidence colored motion pictures with the sound of a train purporting to run over the crossing and section in question. Appellants argue that the prejudice lay in the fact that the conditions and circumstances indicated by the colored sound motion pictures were entirely dissimilar, and that the only purpose and effect these pictures could have had upon the jury was one of prejudice and one which could not fail to mislead the jury with respect to the facts of the case. Appellants point out that the pictures showed a train passing over the crossing during the day while the accident occurred at night; that most of the pictures showed the train passing the crossing; that only a small portion showed the train ap-

proaching the crossing; and that the sound of the train whistle and bell was distorted when heard within a small room.

While it is true that some dissimilarities did exist, we do not believe that this court can say that the trial court abused its discretion in permitting the moving picture to be shown.

■ As this court said in *Barone* v. *Jones*, 77 Cal.App.2d 656, at page 661 [176 P.2d 392, 177 P.2d 30]:

"It is the province of the trial judge to determine whether a proffered photograph of the scene of an accident involved in the litigation fairly depicts the location and surrounding objects which are pertinent to the issues involved in the case. In the absence of an apparent abuse of discretion, or an affirmative showing of prejudice, the order admitting or rejecting a photograph will not be disturbed on appeal. (*Olson* v. *Meacham*, 129 Cal.App. 670, 673 [19 P.2d 527]; *Hayes* v. *Emerson*, 110 Cal.App. 470 [294 P. 765]; 32 C.J.S. p. 625, § 716; 10 Cal.Jur. p. 896, § 169.)"

Appellants rely heavily on the case of *Anello* v. *Southern Pacific Co.*, 174 Cal.App.2d 317 [344 P.2d 843], which was an action involving a collision of an automobile and a train at a railroad crossing. The court was sharply critical of the admission into evidence of colored photographs of a diesel switch engine painted a brilliant orange rather than a black steam engine which was the type involved in the accident, and a train made up of a different number of cars of different shapes, where the fact in issue was what the driver of the automobile could or could not have seen just prior to, as well as at the time of, the collision. However the court did not state that the admission of the colored slides constituted reversible error but stated at page 323: "We need not decide whether the introduction of the colored slides standing alone would constitute reversible error, since the giving of the stop, look and listen instruction requires a reversal of the judgment."

■ In the instant case the motion picture would have some relevancy in determining the time the train crew had to react from the time the train reached the whistle post until it reached the crossing. We must assume that the members of the jury were intelligent people and that they understood and took into account the differences pointed out by appellants.

■ Appellants also contend it was improper for the court to permit the bell on a model of the wigwag signal to be rung in the courtroom. Again appellants complain because of the distortion of sound. What we have said regarding the ad-

mission of the motion picture applies with equal force to this contention.

Appellants also contend that the trial court should have ordered the respondent to answer certain interrogatories. The first was Number 13, which reads: "Please state in detail what was done by the defendant Southern Pacific Company with reference to curtailment of personnel in the section gang, and of the number of personnel employed in the maintenance of tracks and crossings in the Stockton-Lathrop-French Camp area during the year preceding the date of the accident. . . ." We do not see how the number of maintenance personnel is relevant. Either the crossing was negligently maintained or it was not and the condition of the crossing would disclose this. In any event all orders of respondent relative to the curtailment of section-gang maintenance were furnished appellants, and the failure to answer this interrogatory could not have been prejudicial to appellants.

The next interrogatory which appellants contend should have been answered was Number 16, which reads: "At what precise time do the records indicate that the Western Pacific train cross the Southern Pacific tracks at French Camp, or at the Western Pacific crossing intersecting the defendant's tracks immediately north of the point of the accident?" No prejudice resulted from a failure to answer this question because a question was answered relating to the speed of the train, which appellants state was the reason why the information was sought.

The next interrogatory which appellants contend should have been answered was Number 22, which requested respondent to "[s]et forth the contents of all Form 2611 reports made by all employees of the Southern Pacific railroad company in connection with the accident in this case." This interrogatory was objected to on the ground that the information was privileged. The affidavit in support of the objection stated that said Form 2611 reports "are primarily used for the purpose of preparing the prosecution and defense of litigation arising out of such grade crossing accidents, . . ." and that such reports "are confidential communications between Company employees or agents and the Law Department and attorneys for Southern Pacific Company."

The affidavit stated further:

"4. That the established custom and practice of Southern Pacific Company is to undertake defense of actions arising out of grade crossing accidents on behalf of Company em-

ployees involved in such accidents; such employees do not retain their own attorneys but are defended by attorneys employed by Southern Pacific Company.

"5. That to defend such legal actions and to represent Southern Pacific Company and its employees in connection with legal matters concerning such actions, Southern Pacific Company maintains a Law Department, one part of which is commonly designated as the Claims Department.

"6. That as a subdivision of the Law Department, the Claims Department undertakes the investigation of all grade crossing accidents in which Southern Pacific Company or its employees may be involved."

The affidavit also stated, "said Form has required that employees give the names of witnesses at the scene of such accidents, their opinion as to the cause of such accidents, statements made by persons involved in such accidents, and a statement of all the circumstances surrounding the accident as gathered from the observations of the crew members and information supplied to crew members by other witnesses," and that upon the institution of litigation arising out of a grade-crossing accident, reports have been and are delivered to the attorney designated by the law department to handle the particular litigation.

The foregoing affidavit was uncontradicted as to the purpose of the reports, but appellants argue that the affidavit itself clearly shows the relevancy of such reports. There is no question but that the reports requested were relevant and material, but respondent contends that they are not proper matters for discovery because of their confidential nature.

If the information sought to be obtained were privileged, the court properly refused inspection. ▮ In *Holm* v. *Superior Court*, 42 Cal.2d 500, it is said at pages 507-509 [267 P.2d 1025, 268 P.2d 722]:

"In any given situation it is necessary that a determination be made concerning the facts asserted as a basis for the privilege. This determination is for the trial court in the first instance. Where it is clear that the communication has but a single purpose, there is little difficulty in concluding that the privilege should be applied or withheld accordingly. ▮ If it appears that the communication is to serve a dual purpose, one for transmittal to an attorney 'in the course of professional employment' and one not related to that purpose, the question presented to the trial court is as to which purpose predominates. The question then is whether the conclusion of the trial court

on the facts is correct or has resulted in an abuse of discretion. ...

"The present proceeding calls for the determination of the dominant purpose for which the reports and photographs were created. As previously stated, the affidavits of the petitioners in the trial court revealed that the documents were prepared as confidential communications to the city attorney in threat of litigation and that the documents had at all times been treated as such. These affidavits were uncontradicted as to the purpose of the documents. In this connection the plaintiff asserts only that they were prepared in the regular course of business. ▮▮▮ But there is no valid basis for a distinction between a communication created for transmittal to an attorney to prepare for threatened litigation following particular accidents, and a communication prepared for an identical purpose under standing rules in the case of all accidents involving personal or property injury. Because the scope of the operations of the defendant city's municipal railway is such as to require communications of this nature as a routine matter, it cannot be said that the attorney-client privilege did not attach.

▮▮▮ "In any action for damages such as the pending one it is of considerable importance to obtain all information available at the scene of the accident in order to safeguard the rights of the party likely to be charged with negligence. It is because of this fact that diligence is required in behalf of such party to avoid or prepare for litigation. In view of the imminent possibility that the city would be faced with a claim involving substantial liability for personal injuries far exceeding financial considerations in any other respect, it is unreasonable and unrealistic to say that the communication of the documentary information to the attorneys for use in their professional capacity was not foremost and predominately in the minds of those securing and transmitting the same."

▮▮▮ In view of the decision of the Supreme Court in the Holm case by which we are bound, we conclude that it was for the trial court to determine what was the dominant purpose of the requested reports, and in the face of the affidavit that the primary purpose of the reports was for the purpose of the prosecution or defense of litigation, we cannot say that the trial court abused its discretion in denying inspection.

▮▮▮ Appellants contend also that the court erred in sustaining objections to Interrogatories 31 and 32 which read:

"31. Q. State the names of the persons involved, including

the names of the engineer, conductor and fireman, and the names of any other persons involved in any accident occurring at the crossing in question, and in connection with any vehicle crossing or attempting to cross the tracks, within a period of ten years prior to the date of the accident in question, to-wit: December 8, 1957.''

''32. Q. State the names of any persons driving any vehicle at the crossing, whose vehicle left the paved portion of the road crossing the tracks in the area in which the accident in question in this case occurred.''

Both of these interrogatories were objected to upon the same ground of privilege. This objection was supported by the same affidavit of privilege and was sustained by the trial court.

We do not believe that there is anything privileged about the information requested, but we doubt that the appellants were entitled to have respondent go back over a period of 10 years as requested by Interrogatory Number 31, or indefinitely as requested by Interrogatory Number 32.

Appellants fail to point out how they were prejudiced by the court's ruling on these interrogatories and no error resulted.

Appellants also contend that the court erred in sustaining an objection to Interrogatory Number 33 which reads:

''Q. Set forth the contents of any correspondence, letters, or communications of any of the employees or officers of the defendant of or pertaining to the crossing in question in this case above referred to, within the last two years.''

Objection was made to this interrogatory ''upon the ground that the precise documents required are not designated as required by Section 2031 of the Code of Civil Procedure.''

Appellants were of course entitled to have this interrogatory answered. Respondent was required to answer Interrogatory Number 18 which reads: ''Q. State what was set forth in any written communications, letters, or orders pertaining to the crossing above referred to [involved in the accident in question], . . . , within a period of two years prior to the date of December 8, 1957, to date.'' Since this interrogatory called for substantially the same information, we do not believe that appellants suffered any prejudice from the ruling.

Appellants attack a number of instructions given by the trial court. They first contend that the court committed error in giving instructions regarding the duty of care of the driver of the vehicle in which the deceased was riding where there was no issue of imputation of negligence from the driver

to the deceased. These instructions, both given at the request of respondent, are as follows:

"You are instructed that Section 575 of the Vehicle Code of the State of California provides that whenever any person driving a vehicle upon a highway approaches a railway grade crossing and a clearly visible electric or mechanical signal device gives warning of the immediate approach of a railway train, the driver of such vehicle shall stop within 50 feet but not less than 10 feet from the nearest track of such railway, but need not remain standing if he can proceed in safety." (Defendant's Instruction No. 33.)

"If it should appear from the evidence that a ~~person~~ the driver of a vehicle who was nearing a railroad crossing saw or heard a train rapidly approaching on the tracks, but nevertheless, the driver failed to heed the warning of danger or raced against the train, and endeavored to cross the tracks immediately ahead of the train, such ~~person~~ driver would be guilty of negligence.

"When a person is riding in a vehicle as it approaches a railroad crossing, and he knows, believes, or, in the exercise of ordinary care, has reason to believe, that the driver intends to cross the tracks, and if he, the rider, is in a position to look or listen for the approach of engine, cars or train upon the track from either or both directions, he has a duty to do so in the exercise of ordinary care for his own safety.

"If the rider is aware that the driver is not looking for trains, or is driving the vehicle in a negligent manner, or is violating the law, or that an engine, car or train is approaching on the tracks and is so close as to constitute an immediate hazard to those in the vehicle, he has the duty of doing whatever a person of ordinary prudence in the same situation would do to inform, warn or request the driver in an effort to prevent an accident."

Appellants contend that these instructions dealing with the negligence of Vales were confusing and improper. If these were the only instructions given on the subject of the negligence of Vales, there would be merit in appellants' argument. However an examination of all of the instructions discloses that the trial court clearly instructed the jury that such negligence could not be imputed to the deceased. These instructions, all given at appellants' request, are as follows:

"You are instructed that the negligence, if any, of the automobile driver, James Vales, may not be imputed to the

decedent, and therefore, if you should find that both said driver JAMES VALES, and defendant SOUTHERN PACIFIC COMPANY, were negligent, and their concurring negligence was the sole proximate cause of the accident, you are not to compare the negligence of one with that of the other, but should return a verdict for the plaintiffs.'' (Plaintiffs' Instruction No. 46.)

''You are reminded of the fact that the vehicle in which the decedent, EDWIN A. GREENEICH, was riding at the time of the accident in question was then being operated by JAMES T. VALES. You are instructed that the said driver's negligence, if any, may not be imputed to the deceased person, and that therefore, you shall find that said decedent was not guilty of contributory negligence unless you should find that there was personal negligence on his part; that is, some negligent conduct of his own, which contributed as a proximate cause to his injury and subsequent death.'' (Plaintiffs' Instruction No. 44.)

''If you find that at the time and place of the happening of the accident in question in this case, that the deceased, EDWIN A. GREENEICH, was without fault, and if you further find from a preponderance of the evidence that the death of said EDWIN A. GREENEICH was proximately caused by any negligence on the part of the defendant, SOUTHERN PACIFIC COMPANY, then you are instructed that the plaintiffs are entitled to recover, even though you may find that other persons may have also been negligent, and even though they may have been more negligent than the defendant SOUTHERN PACIFIC COMPANY.'' (Plaintiffs' Instruction No. 45.)

''You are instructed that if you find from a preponderance of the evidence in this case that the Southern Pacific Company was guilty of ~~only slight~~ some negligence proximately causing the accident in question and the death of EDWIN A. GREENEICH, then, even though JAMES T. VALES may have been guilty of greater negligence, nevertheless, you are instructed that you must return a verdict in favor of the plaintiffs and against the defendant, SOUTHERN PACIFIC COMPANY if you find that the deceased was at all times in the exercise of ordinary care.'' (Plaintiffs' Instruction No. 47.)

All of the instructions given by the court must be read together, each instruction being considered in connection with the others. We believe that these instructions made it plain to the jury that the decedent was not bound by any negligent conduct of the driver. The conduct of the driver was

certainly relevant to the standard of care to be exercised by the train crew. In order for the jury to determine what the train crew should have done in approaching the crossing, it was quite proper for the court to inform the jury what duty of care the train crew could reasonably expect from the driver of an automobile. The two instructions complained of by the appellants covered this situation.

Appellants complain also that the court refused to give their Instruction Number 43 and Instruction Number 48 which read as follows:

Number 43. "Section 596.4 of the Vehicle Code of the State of California provides in part as follows:

" 'No person shall wilfully interfere with the driver of a vehicle or with the mechanism thereof in such manner as to affect the driver's control of the vehicle.' "

Number 48. "Evidence has been received bearing on the conduct of the driver of the automobile in which the deceased was a rider at the time of the accident.

"You must not permit such evidence, or the comment of counsel concerning it, or your consideration of that evidence, to direct your attention away from the rule of law that if plaintiffs otherwise have a cause of action against the defendants, the same shall not be barred by negligence, if any, on the part of the driver.

"Evidence concerning that driver's conduct has been received and is relevant in this case because the conduct of the driver is one of the several factors in all of the circumstances that you must consider in order to determine what happened, how it happened, and who, if anyone, is responsible in damages."

Appellants' objection to the court's failure to give their Instruction Number 43 is adequately answered by the fact that the court gave Plaintiffs' Instruction Number 39, which reads in part:

"The rider in a vehicle being driven by another has the duty to exercise ordinary care for his own safety. This duty, however, does not necessarily require the rider to interfere in any way with the handling of the vehicle by the driver or to give or attempt to give the driver advice, instructions, warnings or protests. Indeed, it would be possible for a rider to commit negligence by interfering with or disturbing the driver."

Likewise appellants' objection to the court's failure to give their Instruction Number 48 is adequately answered by Plain-

tiffs' Instructions 44, 45 and 47, hereinbefore set forth, which were given by the court.

Appellants' next contention is that the court erred in giving Defendant's Instruction Number 38 and Instruction Number 39 which read as follows:

Number 38. "Streets and highways are within the jurisdiction and control of the State of California, counties and cities thereof.

"The defendant railroad had no authority over, or right to determine the direction, shape or alignment of Ash Street, nor any responsibility therefor. Neither did said defendant railroad have any authority over, nor responsibility for the condition of the surface of Ash Street, except as follows:

"The defendant railroad's only responsibility in this respect is to maintain the surface of the street between the tracks and on two feet of each side of the rails within the outer edges of the street improved for vehicular travel."

Number 39. "You are instructed that the right of way of a railroad company is private property, and that there is no duty resting upon the defendant Southern Pacific Company to widen the crossing involved in this case in the absence of a condemnation proceeding brought by proper public authority, or an order of the Public Utilities Commission of the State of California.

"Since the evidence in this case does not disclose that a wider crossing over the tracks of the defendant railroad has been condemned by the County of San Joaquin, the State of California, or any other public agency, and also the evidence does not disclose any order of the Public Utilities Commission of this State requiring such widening of the crossing, then I instruct you that liability of the defendant Southern Pacific Company cannot be predicated upon any alleged failure to widen the crossing, and you are to disregard any contentions made by the plaintiffs that the defendant had any such duty."

Appellants argue "These instructions, instead of stating that the railroad would be held to the standard of a prudent man maintaining a similar crossing, merely stated that the railroad had no duty or responsibility with regards to the width of the crossing. The jury could well have concluded that there was no duty upon the railroad to widen a portion of the crossing so that the southerly surface thereof would be reasonably straight, and without substantial variation in the straightness thereof, as was clearly manifested by the photographs."

We do not believe that it was error to give the instructions complained of as they correctly stated the law. Respondent railroad company would not have the right to widen the roadway established by the highway authorities. It is difficult to understand how appellants could suffer prejudice from these instructions because the court gave Plaintiffs' Instruction Number 26 and Instruction Number 27, which read:

Number 26. "I instruct you that the duty to exercise reasonable or ordinary care is imposed upon the operator of a railroad at public highway crossings with respect to persons travelling upon the highway and over the crossing, both as to the manner of operation of the train and the maintenance of the crossing. The standard of care is that of the man of ordinary prudence under the circumstances."

Number 27. "It is the duty of a railroad company, and its employees operating its trains, to exercise reasonable care in the warning and for the safety of travelers on a public street that crosses the tracks of the company.

"Any measures that would have been taken by reasonably prudent railroad management and train operation to protect travelers on the street in question, and at the time in question, from the dangers of the crossing were measures required of the defendant railroad company and its employees."

These two instructions did tell the jury that respondent railroad company would be held to the standard of care that would have been taken by reasonable railroad management and train operation.

Appellants contend also that the court "committed reversible error when, after the completion of the trial, the jury was instructed upon the issue of contributory negligence upon the part of the deceased, and where, under the pre-trial order in connection with the case, no such issue was presented." Appellants quote paragraph 4 of the pretrial order which reads:

"4) The answer alleges the affirmative defense of contributory negligence on the part of the decedent. There have been some facts developed by the investigation of the defendant which indicate the possibility that James T. Vales was acting as agent for the decedent, or in a joint venture with the decedent at the time of the accident. Therefore, the theory upon which the decedent is charged with contributory negligence rests upon the imputation of the negligence of James T. Vales to the decedent. As presently drawn, the affirmative defense of contributory negligence is not specific enough to

raise this defense. Prior to trial, however, the defendant will either abandon this defense entirely or will ask leave to amend the affirmative defense to specifically allege that the negligence of James T. Vales was imputed to the decedent either upon the theory of agency or joint venture, or both.

"That if the defendant desires to replead contributory negligence as a defense it may do so."

Notwithstanding the language of the pretrial order, which is not entirely clear to us, it appears that both the first trial and the second trial of the case proceeded on the assumption and acquiescence of counsel and the court that contributory negligence was an issue in the case. Both appellants and respondent submitted instructions on contributory negligence which correctly stated the law and were given by the court.

Counsel for appellants state that at the opening of the case plaintiffs, as well as the defendant, tendered to the court instructions with regard to the issue of contributory negligence only upon the assumption that such issue might arise, but that at the conclusion of the case there was no such issue. However the record shows that the introduction of evidence was completed on Thursday afternoon, April 16th; that the case was argued to the jury on Friday; and that the court then adjourned until Monday, when the court instructed the jury. The record does not show that appellants withdrew any of their instructions on contributory negligence or made any claim that it was not an issue, although they had ample time to do so between the time the evidence was completed and the time the jury was instructed. We conclude that they are hardly in a position to claim that contributory negligence was not an issue in the case, particularly in view of the fact that the answer did allege that the decedent was negligent and that his negligence was a proximate cause of the accident.

▇▇▇▇▇ Appellants' final contention is that the court committed reversible error in giving the following instruction on imminent peril:

"Members of a train crew who, without negligence on their part, are suddenly and unexpectedly confronted with peril arising from either the actual presence or the appearance of imminent danger to themselves or to others, are not expected nor required to use the same judgment and prudence that is required of them in the exercise of ordinary care in calmer and more deliberate moments. Their duty is to exercise only the care that an ordinarily prudent person would exercise in the same situation. If at that moment they do what appears to

them to be the best thing to do, and if their choice and manner of action are the same as might have been followed by any ordinarily prudent persons under the same conditions, they do all the law requires of them, although in the light of after-events, it should appear that a different course would have been better and safer.''

"[A] party has a *right* to instructions on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may be properly drawn from the evidence. . . .'' (2 Witkin, California Procedure, Trial, § 52, p. 1780.)

The engineer testified, in part, as follows: "Well, when the fireman started hollering, whatever it was, which I couldn't hear on account of the whistle and the noise of the motors, I was blowing the whistle with my left hand, I let go of the whistle with my left hand and took it with the right and kept on whistling and put my hand on the brake valve to be prepared for whatever showed up, and about the time that he got through hollering, whatever it was which I couldn't hear on account of the whistle, that car lit right in front of me about 10 car lengths away, or about eight seconds, and I applied the emergency with my left hand because he had alerted me that something was wrong there. What it was I could not tell or hear.''

It is inferable from the testimony recited that the engineer was alerted to a danger before he actually applied the brakes. The length of time is of course conjectural. But we think that the jury could infer that if the engineer had applied the emergency brakes immediately upon being alerted to the danger the train may have slowed sufficiently to give the deceased additional time to get out of the car. If such inferences can be drawn from the evidence, then the engineer had alternative courses of action. He could attempt to stop the train immediately or he could wait until he could see what the emergency was.

The rule is stated in the Restatement of Torts, section 296, as follows: "In determining whether conduct is negligent toward another, the fact that the actor is confronted with a sudden emergency not caused by his own tortious conduct which requires rapid decision is a factor in determining the reasonable character of his choice of action.'' The rule is applicable to the facts of this case.

If our analysis of the evidence is correct, it was not error to instruct the jury on the doctrine. Clearly the

instruction had to refer to the train crew because the actions of the engineer and the fireman are to be considered together in determining whether or not there was a sudden emergency. One could not isolate himself from the other in a situation where the two worked as a team.

Because of the numerous contentions of error urged by appellants we have made a careful study of the entire record in the instant case. We are satisfied that the evidence not only supports the judgment but that it preponderates in favor of respondent. We are satisfied also that the jury was fully and correctly instructed as to the law applicable to the case. The instant action was tried twice, and after the conclusion of the first trial, which resulted in a verdict in favor of appellants, the trial court granted defendant's motion for a new trial on the ground of the insufficiency of the evidence. A different judge presided at the second trial, and after a comparatively short deliberation the jury brought in a unanimous verdict in favor of defendant. Plaintiffs' motion for a new trial was denied. Taking the record as a whole and bearing in mind the plain and meaningful words of section 4½ of article VI of our state Constitution, we are satisfied that even if appellants are correct in some of their contentions of error no miscarriage of justice has resulted.

The judgment is affirmed.

Van Dyke, P. J., concurred.

PEEK, J.—I dissent. As I view the record, it does not support the conclusion of the majority that the evidence "preponderates in favor of respondent." It presents a close case on the facts and one in which the verdict of the jury, whether in favor of the defendant or plaintiffs, would be sustained against an attack that it was not supported by substantial evidence. Thus if my conclusion as to the status of the evidence is at all valid, it follows that any error which otherwise might not be offensive becomes more meaningful and therefore could well be prejudicial.

In particular I cannot agree with the majority in its approval of the action of the trial court in permitting the defendant to show sound colored motion pictures and to ring a crossing bell within the close confines of the courtroom. My objection is not directed at sound motion pictures as such, but rather at the particular pictures here in question when considered in light of the facts and issues in this case, as well as in the

manner of their presentation to the jury. I am entirely in accord with the views expressed in *People* v. *Hayes,* 21 Cal. App.2d 320 [71 P.2d 321], approving the utilization of sound motion pictures as a modern scientific means of ascertaining the facts. However, the propriety of the admission of such evidence in one situation is not at all determinative of the admission of like evidence in all situations. In other words, each case must be determined on its own peculiar facts. Although somewhat fearful of belaboring this issue, nevertheless the sound motion pictures here in question point up what I feel to be a lurking vice in such evidence; that is, the inherent susceptibility to exaggeration of motion and sound, and hence, consciously or unconsciously, the creation of an entirely false impression in the minds of the jurors.

Undoubtedly our Supreme Court had somewhat the same thought when it cautioned that: "A motion picture of the artificial recreation of an event may unduly accentuate certain phases of the happening, and because of the forceful impression made upon the minds of the jurors by this kind of evidence, it should be received with caution. As pointed out by Wigmore, such a portrayal of an event is apt to cause a person to forget that 'it is merely what certain witnesses say was the thing that happened' . . . (3 Wigmore, Evidence [3d ed.], § 798a, p. 203)." (*People* v. *Dabb,* 32 Cal.2d 491, 498 [197 P.2d 1].)

At the outset, the admission of sound motion pictures presents primarily a question of relevancy. "In other words, to be admissible motion pictures must tend to prove or disprove some issue in the case, and consequently the relevancy of motion pictures necessarily depends upon the issues in the case and the subject matter of the film." (62 A.L.R.2d 691.) To assist the court in determining the question of relevancy it has been held that: "In ruling upon the admissibility of photographs, the trial judge has two primary duties; one, to determine whether the photograph is a reasonable representation of that which it is alleged to portray and, second, whether the use of the photograph would aid the jurors in their determination of the facts of the case or serve to mislead them." (*Anello* v. *Southern Pacific Co.,* 174 Cal.App.2d 317, 323 [344 P.2d 843].) In that case the accident occurred on a clear day while decedent was driving an automobile across defendant's tracks. The locomotive involved was the conventional-type black steam engine. The court in disapproving the admission of still photographs showing a diesel engine, the

front of which was painted a "brilliant orange," and the train made up of a different number of cars of different shapes from those on the train involved, held that: ". . . it can hardly be said that the jury was shown an approximate reproduction, or a substantially similar representation, of that which the deceased could have seen at the time of the accident."

In the present case the camera and sound recorder had been set up in the center of the intersection. The motion pictures began by first showing one of defendant's freight trains approaching the intersection with its whistle blowing. The camera was then turned and focused directly upon the approximately mile-long train during the entire time it took to cross the intersection, with all of its attendant noise; and lastly, the camera was turned on the train as it receded in the distance with its whistle still blowing intermittently. It thus appears that in the present case the disparity between what the jury was shown and what the deceased could have heard or seen at the time of the accident is even more pronounced than in the Anello case. Bearing in mind that the accident occurred at an unlighted intersection on a foggy night, how can it be said that the pictures were an approximate reproduction or even a substantially similar representation of the situation as it existed immediately prior to the time of the accident?

However, the defendant, in support of the action of the trial court, argues that since one of plaintiffs' contentions was that under the facts the train should have been stopped sooner, the pictures were proper because "laymen . . . not acquainted with railroad equipment, will consider that a train might be as maneuverable as an automobile" and also to show "the tremendous problem in stopping the equipment, and the short length of time that the train crew had to react." The majority opinion agrees at least to a degree with defendant's argument, holding that: ". . . the motion picture would have some relevancy in determining the time the train crew had to react from the time the train reached the whistle post until it reached the crossing." It is true that one of plaintiffs' contentions was that the train should have been stopped sooner. But in the motion picture no attempt whatever is made to show "the tremendous problem in stopping the equipment" or that the train was not "as maneuverable as an automobile"; and furthermore, since the pictures were taken in broad daylight they did not show the only thing visible at night, the headlight, which counsel for defendant admits was "obviously" the only thing which the driver of the car could have seen.

As previously stated, the sound pictures did not in any way portray the purpose for which they were introduced; nor did they in any way depict the physical surroundings existing at the time of the accident, except for the facts that a diesel locomotive and a comparable number of freight cars were crossing the same intersection, the diesel had a whistle, and there was a bell at the intersection.

Lastly, the motion pictures were shown to the jury with all of the attendant sound of a diesel engine with a 5,000-foot-long-freight train thundering across the intersection with its air horn blowing intermittently, and all within the narrow confines of the courtroom. Defendant's witnesses admitted the sound was not proportionate and it is difficult to see how it could have been in the closed room. One of the issues in the case was whether the whistle had been blown. Obviously, therefore, the extraordinarily distorted noise of a fast-moving freight train, as well as the volume of the whistle on the diesel, were significant. The same argument is equally relevant to the ringing of the bell in the courtroom, which unquestionably distorted its sound.

The only question remaining, then, is whether this error was so prejudicial as to warrant a reversal (Cal. Const., art. VI, § 4½). I am of the opinion that it was.

One of the principal issues of this case was the contributory negligence of the decedent. I am convinced that the sound motion pictures and bell were irrelevant and extremely damaging to the plaintiffs on this issue. By such evidence it was indelibly impressed upon the jury that no man, reasonably prudent or not, would have failed to be sufficiently warned of the impending disaster, and hence, to remain in the automobile under such conditions was tantamount to a desire to end his own life. In addition, it should be remembered that at the first trial this evidence was not offered and the jury returned a verdict for the plaintiffs; whereas in the present case, on retrial, it was offered as the final dramatic evidence on behalf of the defendant who, at the conclusion of the showing, rested its case.

For the reasons set out above the judgment and order should be reversed.

A petition for a rehearing was denied March 14, 1961. Peek, J., was of the opinion that the petition should be granted. Appellants' petition for a hearing by the Supreme Court was denied April 12, 1961. Peters, J., and Dooling, J., were of the opinion that the petition should be granted.