[Civ. No. 15352. First Dist., Div. One. Mar. 5, 1953.]

CHESTER A. GREEN, JR., Respondent, v. KEY SYSTEM TRANSIT LINES (a Corporation) et al., Appellants.

Donahue, Richards, Rowell & Gallagher and George E. Thomas for Appellants.

Ricksen, Freeman & Johnson, Kennedy Jackson and Stanley C. Smallwood for Respondent.

BRAY, J.—From a judgment on a jury verdict awarding plaintiff $32,500 for injuries received in a railroad crossing accident, defendants appeal.

## QUESTION PRESENTED

Was plaintiff guilty of contributory negligence as a matter of law? The answer depends, in turn, upon the obligation of a vehicle driver approaching a railroad crossing at a blind street intersection.

## FACTS

It is conceded that the evidence supports the jury's implied finding of defendants' negligence. Taking the evidence and the reasonable inferences therefrom most strongly in plaintiff's favor, as we are required to do (*Crawford* v. *Southern Pac. Co.*, 3 Cal.2d 427 [45 P.2d 183]), the facts follow. Plaintiff was driving a milk truck at the intersection of 46th Street and Linden Street, Oakland. Linden Street runs generally north and south; 46th Street east and west. The paved portion of 46th Street is 36 feet wide, widening out, however, in the intersection. Linden Street is 130 feet wide, unpaved, except at the intersection. Both the northwest and southwest corners are occupied by buildings constructed up to the property lines. Running north and south on Linden Street are four sets of tracks of the Key System. At the northwest corner is located the Remar Baking Company build-

ing. From its wall easterly to the first track is approximately 35 feet, roughly one-half of which was a graveled shoulder and the other a graveled or dirt roadway. The line between the shoulder and roadway is not defined. Except at the intersection the railroad bed is unpaved and the rails are laid on bare ties. A police officer characterized the intersection as a blind one. Automobiles were parked on Linden Street in front of the Remar building. Apparently this was customary as plaintiff had seen automobiles parked there before. Approximately 250 to 300 feet north of the crossing the tracks curve. There was a railroad crossing sign, or crossarm, near the curb on the southerly side of 46th Street a short distance from Linden and a white "X" on a black background overhead approximately at the entrance of the intersection. The crossing was practically at grade, the grade, if any, so slight as not to be noticeable. Plaintiff was familiar with the crossing having driven over it for three weeks before. On this occasion he saw the crossarm and was aware of the tracks as he approached. For three weeks he had been a retail milk route driver for the South Berkeley Creamery. Plaintiff testified the accident happened between 7:55 and 8:00 a. m. The conductor stated it happened at 7:52. Plaintiff operated the milk truck standing up, with the doors open. The truck has gears like an automobile with one difference in gear position. The same pedal operates both the brake and the clutch, the clutch being thrown at a position half way down the pedal. Schlater, the creamery's then route foreman, was standing up at plaintiff's right. Plaintiff testified that he was driving 10 to 15 miles an hour in the short block leading to the intersection. He was going easterly on 46th Street. As he approached he slowed down to 4 to 6 miles an hour before coming out beyond the buildings. Schlater testified that the truck approached the intersection at not over 15 miles an hour, that it slowed down to 8 to 10 miles an hour and then came almost to a stop at a speed of 4 to 5 miles an hour, at which speed it continued until the occurrence of the accident. Apparently the truck did not stop. Plaintiff also stated that the truck proceeded to the point of impact at 4 to 6 miles an hour, although it had stopped just before it was hit by the train. After coming out into the intersection from between the buildings plaintiff looked to his left (or north, the direction from which the train came). In so looking to the left he drove 10 to 15 feet. His vision was partially cut off by the diagonally parked cars; they blocked his view

of the tracks. (In his deposition he denied that they did.) The detail of his testimony on this subject will be given later. He could not say whether when he stopped looking left he had cleared the obstruction or saw the tracks. He then looked to his right traveling about 10 to 15 feet. When he looked to his left again the front of his truck was probably 10 to 12 feet from the nearest track and the train was about 90 to 100 feet away coming towards him on that track. At this position he could not stop his truck before it reached the track. Had he not looked right he would have seen the train up the track. His brakes were in good condition. Neither plaintiff nor Schlater heard any warning whistle or bell until Schlater heard the bell when the train was about 15 feet away. His speed was 4 to 6 miles an hour and it would require 10 to 12 feet to stop. He would have stopped before reaching the track if he had been able to. He immediately stepped on the brake pedal and stopped his truck with the front end over the first rail but not extending to the second rail. When he stopped the train was not quite 49 feet away. He tried to shift into reverse but the train hit the truck and he does not know whether he succeeded. He received serious injuries. As defendant does not challenge the amount of the verdict, it is unnecessary to detail the injuries. Generally Schlater corroborated plaintiff's testimony, except that he testified that after slowing to 4 to 5 miles an hour the truck's speed increased to 8 to 10 miles an hour. He also testified that the truck proceeded 4 to 5 miles an hour until the accident. Schlater jumped just before the truck was hit. When they came into the intersection he looked both ways. He does not remember if he first looked left. When he did look left the truck was about 8 feet from the track and the train was two-thirds of the bakery building away from the crossing.

The motorman testified that he blew his whistle 200 to 250 feet from the intersection and sounded the bell for 65 feet from the intersection and 80 to 85 feet from the point of impact. The train could have been going at a speed as high as 27 miles an hour and continued until after he had seen the truck and up to the point 15 to 20 feet from the point of impact when he threw the train into emergency. He used no power, however. He was going 15 to 20 miles an hour at the moment of impact. It takes 200 feet to stop a train at 20 miles an hour, 300 at 25. He could see the intersection from 250 feet away. He was 60 to 65 feet from

the intersection when he first saw the truck which was then 15 to 20 feet from the track. The truck was going 15 to 20 miles an hour, but it slowed down to 5 to 8 miles an hour and rolled on the track at about 2 miles an hour. When the truck was 15 to 20 feet from the track the driver was looking south (the opposite way from the train), and the passenger was looking north, both talking. (Plaintiff and Schlater both denied they were talking at this time.) He noticed only one diagonally parked car at the point where plaintiff testified there were several. The train conductor testified that the truck was going 10 to 12 miles an hour on approaching and had stopped on the track for about 2 seconds before being hit. Other defendants' witnesses noted a heavy application of the truck's brakes, stating that the truck approached at 15 miles an hour, did not slow down and arrived simultaneously with the train. Witnesses called by defendants concerning the whistle and bell gave divergent testimony. Some heard one, some two whistles. All heard the bell but differed as to when it started in the interval between the whistle and the application of the train's brakes.

### PLAINTIFF's DUTY

Defendants make two contentions in their claim that plaintiff was guilty of contributory negligence as a matter of law: (1) He failed to look in the direction of danger at a proper place. (2) He failed to see the approaching train when he looked.

The law as to the duty of a vehicle driver approaching a railroad crossing has undergone considerable change since the rather unrealistic doctrine of "stop, look and listen" was evolved by Mr. Justice Holmes in *Baltimore & Ohio Ry Co.* v. *Goodman,* 275 U.S. 66 [48 S.Ct. 24, 72 L.Ed. 167]. *Griffin* v. *San Pedro, L. A. & S. L. R. R. Co.,* 170 Cal. 772 [151 P. 282, L.R.A. 1916A 842], and *Eddlemon* v. *Southern Pac. Co.,* 41 Cal.App. 340 [182 P. 811], followed this doctrine. In *Koster* v. *Southern Pac. Co.,* 207 Cal. 753 [279 P. 788], relying on the Baltimore & Ohio Ry. Co. case and the Griffin case, the court even went so far as to state that the driver of a vehicle approaching an obstructed railroad crossing might even be required to stop and get out of his vehicle. At least he must "stop and look." (P. 763.) There are many other cases to the same effect, including *Murray* v. *Southern Pac. Co.,* 177 Cal. 1 [169 P. 675]. As early as *Thompson* v. *Southern Pac. Co.,* 31 Cal.App. 567 [161 P. 21], the court softened the

"stop, look and listen" rule by stating "that the rule requiring the traveler to *stop* is not an absolute one" (p. 572), although in that case it held that the driver should have stopped because of the completely obstructed view almost up to the track itself. (See, also, *Cooper* v. *Southern Pac. Co.,* 43 Cal.App.2d 693 [111 P.2d 689].) This language is quoted with approval in *Murray* v. *Southern Pac. Co., supra,* 177 Cal. 1, although again there, the court held the driver should have stopped because his view up the track was so obstructed that he could not see further than 15 to 18 feet. In *Swigert* v. *Pacific Electric Ry. Co.,* 7 Cal.App.2d 661 [47 P.2d 353], it was contended that the driver must look not only from a point where he has a *reasonable* view of the track but such point must be the *best possible place available for that purpose.* The court stated that the test of whether due care was used is not what a *very* careful and cautious person would have done, but rather what a person using ordinary care for his own safety would have done under the same or similar circumstances. It then quoted from *Alloggi* v. *Southern Pac. Co.,* 37 Cal.App. 72, 77 [173 P. 1117] : " 'The court did not err in refusing to instruct the jury that it was the duty of the plaintiff to stop, look and listen at the most advantageous place. He was not required to look at the *most* advantageous place, for this would be putting upon him the burden of not only knowing the most advantageous point, but also of exercising the highest degree of care, while all that was required of him was ordinary care.' "

In *Music* v. *Southern Pac. Co.,* 91 Cal.App.2d 93 [204 P.2d 422], the court said concerning the place where plaintiff stopped and looked and from which he could see only 150 feet up the track (p. 96) : "Whether the place selected by respondents to stop and look was the best possible place under the circumstances is immaterial. The operator of an automobile is under a duty to use only that care which a reasonably cautious man would have used under similar circumstances in selecting the place of view. [Citations.] After having so conducted himself, whether or not it was negligent for him to have then proceeded up the grade and across the track, likewise must depend upon whether a reasonable man would have so proceeded under the circumstances then existing."

In *Emmolo* v. *Southern Pac. Co.,* 91 Cal.App.2d 87 [204 P.2d 427], plaintiff looked from a position where "His vision . . . was obscured to 'some' extent by trees and brush along

defendants' right of way, approximately 250 to 300 feet. . . . How far he could see past the obstruction does not appear. . . ." (P. 89.) "In a recent case involving the question of the contributory negligence of a motorist at a railroad crossing the Supreme Court stated that '. . . the actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law. . . .' (*Toschi* v. *Christian,* 24 Cal.2d 354, 360 [149 P.2d 848].) While the Toschi case is not entirely analogous since it involved a crossing protected by flagmen, nevertheless such a difference is only one of the 'material circumstances' by which the 'actor's conduct must always be gauged' and cannot serve to change the question herein involved from one of fact to one of law. In this regard the following language appearing in the Toschi case, *supra,* at page 360 is apropos: 'Standards of care are typically relative; rules of law are basically absolute. Hence, in regard to negligence, any attempt to screen factual conduct into legal classifications through a sieve of absolute law will be impracticable whenever the related circumstances admit of materially conflicting inferences.' " (Pp. 90-91.) "Whether or not his choice of view was that of a reasonably prudent man, exercising reasonable precautions for his own safety, was a question properly left to the jury." (P. 91.)

In *Nelson* v. *Southern Pac. Co.,* 8 Cal.2d 648, the court said (p. 652 [67 P.2d 682]): "But the plaintiff's choice of a position for observation is also a question for the jury. (*Pietrofitta* v. *Southern Pac. Co., supra* [107 Cal.App. 575 (290 P. 597)].)"

In *Southern Pac. Co.* v. *Souza,* 179 F.2d 691, the court well sums up the present situation in this state (p. 693): "Appellant argues that the California courts have established definite standards of care for highway travelers at railroad crossings and that appellee's own testimony shows that he failed to measure up to those standards and was therefore contributorily negligent as a matter of law. Many of the earlier California decisions cited by appellant would seem to sustain this argument.[1] However, the more recent decisions of the

---

[1] Citing and quoting from *Chrissinger* v. *Southern Pac. Co.,* 169 Cal. 619 [149 P. 175]. "To the same effect see *Griswold* v. *Pacific Electric R. Co.,* 45 Cal.App. 81 [187 P. 65]; *Hamlin* v. *Pacific Electric R. Co.,* 150 Cal. 776, 778 [89 P. 1109]."

courts of California, although they have not expressly over-ruled the old cases, show a definite policy trend away from the 'crystallized fact' cases and favor making the standard of care a question for the determination of the jury.[2] Several California decisions have held on similar fact situations that whether or not the driver's choice of a place to look and his failure to look a second time constituted negligence were questions of fact for the jury."

██ A fair summation of the present rule with reference to the duty of a vehicle driver approaching a railroad crossing is that he is not necessarily required to stop. He is required to look. However, he does not necessarily have to look from the best possible available spot as long as the spot selected gives him a reasonably assuring view of the track. (*Koster* v. *Southern Pac. Co., supra,* 207 Cal. 753.)

██ Nor does the fact that his view down the track in the direction from which the train eventually appears, is somewhat obstructed, make him necessarily guilty of contributory negligence as a matter of law. ██ Whether his failure to stop, the place from which he looks, and the character and extent of the obstruction, if any, are such that a reasonably prudent person would not have conducted himself as the driver did, are questions for the jury in determining whether he was guilty of contributory negligence as a matter of fact. (*Toschi* v. *Christian,* 24 Cal.2d 354, 360 [149 P.2d 848].)

### APPLICATION OF LAW TO THE EVIDENCE

Plaintiff testified that the only time he looked to his left was at a point from which his view of the tracks was obstructed by the diagonally parked cars. He could see "more or less" over the tops of those cars. He could not say how far down the track he saw. When asked if he could see as far as the bridge (200 to 250 feet from the intersection), he said he could see "the area more or less; there is a lot of telephone poles and lot of stuff up in that area, but I probably could see the general area, yes, sir." On being asked "You couldn't see the top of any train coming towards you at that time? A. No, sir, I could not." Whether this meant he would not have been able to see such top had a train been there, or merely that he did not see one, it is difficult to tell. However, plaintiff's exhibit 8, a photograph taken a few days

---

[2]Citing and quoting from *Crawford* v. *Southern Pac. Co.,* 3 Cal.2d 427, 429 [45 P.2d 183], and *Peri* v. *Los Angeles Junction R. Co.,* 22 Cal. 2d 111 [137 P.2d 441].

before the trial from the intersection showing the view over the tops of diagonally parked cars, was in evidence without objection and exhibited to the jury. Police Officer Dahl testified without objection concerning this photograph that with the automobiles that were parked there the day of the accident, and with one standing at the edge of the bakery building looking north, the photograph represented a typical view as it existed on that day. The photograph is labeled "View looking north toward Key System right-of-way from a point in 46th Street along a projection of the west property line facing Linden Street." It shows cars parked diagonally in front of the bakery and over the tops of those cars can be seen the trolley wires of the four tracks north as far as the bridge, also trolley and other poles. Considerable area is shown between the wires and the portion of the view obscured by the cars. Defendant contends that from plaintiff's standing position in the truck the upper portion of a train at or south of the bridge would be visible to him over the tops of the parked cars. Plaintiff agrees that "the upper portion of an approaching train, or at least the trolley thereof," would not be obscured by the parked cars.

In view of the facts that plaintiff testified that he could see the area above the cars as far as the bridge, both parties' admissions that the top of the train and the trolley would be visible, plus the very considerable view shown in the photograph (even the side railing of the bridge is visible), we cannot say as a matter of law that the point from which plaintiff looked north was an unreasonable one. Whether it was or not, whether plaintiff having looked and not observed such portion of the train as would have been visible were it within the approximately 200 feet within his vision, and whether continuing on under the circumstances constituted contributory negligence, were matters for the jury. (See *Toschi* v. *Christian, supra,* 24 Cal.2d 354, 359, and *Music* v. *Southern Pac. Co., supra,* 91 Cal.App.2d 93.) While plaintiff undoubtedly did not choose the most advantageous spot from which to look up the track, he is not required, as a matter of law, under the herein mentioned authorities, to do so. If a prudent person under the circumstances, with his view partially but not wholly obscured, would have chosen this spot as his viewpoint, the test is met. As we cannot say that such a person might not have so chosen, the question is one for the jury. "In the Koch case (*supra,* 148 Cal. 677 [84 P. 176, 113 Am.St.Rep. 332, 7 Ann.Cas 795, 4

L.R.A.N.S. 521]) the court declared (p. 680) : 'Of course, in any case such as this, where it is shown that a plaintiff has exercised some care, the question whether or not the care actually exercised was due and sufficient will always be a matter for determination by the jury.' '' (*Toschi* v. *Christian, supra,* 24 Cal.2d at p. 361.)

Defendants contend that at the time plaintiff claims to have looked the train was within the 200-foot area visible to him, and hence, he either did not look, or having looked did not see that which was in his range of vision. His failure to see the train, in either event, constituted negligence as a matter of law, say they. Supporting this contention they have worked out a set of graphs showing that the front of the train must have been south of the bridge which was 257 feet from the point of impact, when plaintiff claims to have looked and therefore its top at least was visible to him. These graphs are based upon plaintiff's testimony as to the speed of his truck and his estimates of the number of feet it went in certain intervals. In spite of these graphs the question was one for the jury to determine. Obviously plaintiff's distances were only estimates. Moreover, the computation ignores the time interval when the truck was standing on the track before being struck. Plaintiff testified that after the truck stopped he attempted to shift into reverse, but does not know whether he succeeded before being hit. The motorman testified likewise that he saw plaintiff trying to shift gears, although he places the truck at that moment 2 feet from the track. These mathematical calculations ''may serve as matter for argument before a jury'' (*Dillon* v. *Qualls,* 63 Cal.App. 637, 641 [219 P. 754]) but they are based upon mere estimates and upon occurrences concerning which in *Connerly* v. *Correia,* 66 Cal.App. 570, the court stated (p. 574 [226 P. 841]) : ''Such occurrences take place so quickly that it is not to be expected any one would be able to explain step by step the events as they take place or give anything more definite than a general statement of the events as they were impressed upon the mind by the rapidity of their occurrence.'' ''This is especially true in automobile accidents. Modern psychological experiments have shown that due to the quickness with which an accident happens, those who see it, and those who participate in it, may not get clear impressions. If, after trial, an appellate court attempted to weigh every one of these impressions which may seen contradictory, by the rules of the exact sciences, few verdicts would stand.'' (*Hughes* v. *Quackenbush,* 1 Cal.App.

2d 349, 355 [37 P.2d 99].) In *Nagamatsu* v. *Roher*, 10 Cal. App.2d 752 [53 P.2d 174], the court said concerning arguments similar to those made by defendants (p. 755) : ''As has been frequently pointed out in cases of this nature such arguments are unreliable because they fail to take into account the human element, what may have been done by the respective drivers, and because of the many uncertainties which necessarily exist in such matters as the respective weights of the cars, the respective speeds, the exact positions, the force and direction of the blows, and many other elements.'' In *Hill* v. *County of Fresno*, 140 Cal.App. 272, the court stated (p. 277 [35 P.2d 593]) : ''We think that we are not called upon to indulge in a mathematical calculation in which certain factors must be assumed to be definitely determined in order that we may declare that respondent's testimony was so inherently improbable that the jury was not justified in giving any consideration to it.'' Whether the train was in sight when plaintiff first looked was a matter for the jury to determine. We cannot say as a matter of law that it was.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 4, 1953. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted. Dooling, J. pro tem., acting in place of Traynor, J.