[Civ. No. 12408. Third Dist. Aug. 6, 1971.]

ROSE MARIE LUCAS et al., Plaintiffs and Respondents, v.
SOUTHERN PACIFIC COMPANY et al., Defendants and Appellants.

## COUNSEL

Jones, Lane & Weaver, Jones, Lane, Weaver & Webster and Roy A. Weaver for Defendants and Appellants.

Cardozo, Trimbur & Nickerson, John M. Trimbur and Gary S. Davis for Plaintiffs and Respondents.

## OPINION

**FRIEDMAN, Acting P. J.**—A jury trial in this wrongful death action resulted in a damage judgment for the surviving family. Defendant Southern Pacific Company appeals.

Decedent Raymond Lucas was killed in a grade crossing collision with a Southern Pacific train several miles south of the City of Stockton. At the crossing there were two pairs of railroad tracks, running in a north-south direction. Mathews Road, running in a southwesterly-northeasterly direction, crossed the tracks at a slight angle. Lucas was driving a truck-trailer combination easterly on Mathews Road. The rig had an over-all length of 60 feet. It consisted of a tractor and two hopper-type trailers loaded with bulk grain. Lucas had commenced driving the grain truck only two days before the accident. The accident occurred after Lucas drove his tractor across the westerly pair of tracks. At that time the train (consisting of one locomotive, 5 flatcars and a caboose) was traveling southward on the west pair of tracks. Although Lucas attempted too late to put the truck into reverse and to back off the tracks, the southbound train crashed into the truck-tractor, carrying it 1,789 feet south of the point of impact. Lucas was fatally injured in the collision. The accident occurred during daylight hours on a clear day.

At the west side of the crossing, facing eastbound automobile traffic on Mathews Road, was a white-painted, wooden, railroad crossing sign. An electric wigwag equipped with a light and bell was located on the east side of the tracks, the side opposite to that from which Lucas was approaching. There were no other warning devices at this crossing.

Eastbound vehicles had to travel up an incline to reach the tracks. At the time of the accident a rectangular stack of boxes stood along the west side of the tracks, somewhat north of the crossing. The stack of boxes was about 15 feet high. There is in evidence a diagrammatic representation of the area drawn to scale. According to the diagram, the stack of boxes was about 30 feet wide and had a length of about 70 feet paralleling the railroad tracks. Its easterly line was about 32 feet west of the southbound tracks on which defendant's train was traveling. Its southeast corner was 606 feet north of the Mathews Road crossing. Northward of the box stack was a packing shed.

Two witnesses called by plaintiff, Mrs. DeLong and Mrs. Tomlin, were driving in the former's passenger car immediately behind decedent's truck. According to Mrs. DeLong Lucas' truck drove slowly up the grade and onto the westerly tracks at a speed of about five to seven miles per hour. According to Mrs. Tomlin, the truck was "creeping" up the grade. Mrs. DeLong's car was about 10 feet behind Lucas' truck. The windows of Mrs. DeLong's automobile were rolled down. Mrs. DeLong was familiar with the particular crossing and had traveled across it on many occasions. Both these ladies stated that their view of the train was blocked until the train came into their view past the stack of boxes. Both testified that the wigwag across the tracks did not start operating until the truck was on the tracks. Each lady stated that she heard no train whistle or bell prior to the accident. As the train came into view, the truck stopped and its reverse lights went on. The truck started to back off the tracks but the cab of the truck was struck by the train. The ladies were so close to the point of impact that grain from the truck flew through the open windows of Mrs. DeLong's car. Mrs. DeLong estimated that the train was traveling at 70 or 75 miles an hour when she first saw it.

The wigwag signal was operated by an electrical circuit. The circuit was so designed that the wigwag would commence operating when an approaching train was 3,283 feet from the Mathews Road crossing. Two years prior to the accident the Public Utilities Commission had recommended installation of No. 8 flashing light signals and automatic gate arms at this crossing. Defendant railroad had not complied with this recommendation.

The defense called a number of witnesses. Sammy Davis was standing near the east side of the tracks. He testified that the sound caused by the operation of the wigwag brought his attention to the railroad; he looked up and saw the wigwag in operation; he looked across the tracks and saw the truck approaching. He heard the train whistle; the train was not in his view at the time he heard the whistle; when it came into view, he saw sparks coming from the wheels "like he was applying the brakes." He

testified that the truck continued to move into the crossing, and the collision occurred six to eight seconds after he heard the train whistle.

Mrs. Georgia Young testified that she had pushed her bicycle over the crossing from east to west just before the accident. Immediately after she got across the tracks the wigwag started. She heard the train whistle and the sound of the air brakes. She saw the train as it came from behind a packing shed. She did not see the Lucas truck before the impact. Mrs. Young testified she heard the wigwag continuously from the time it began until the impact took place. Guy Womack, whose home was situated near the west side of the tracks, heard the bell on the wigwag signal and saw the wigwag operating shortly before the accident. He did not see the accident as he left the scene while the wigwag bell was still ringing. Paul Belk was with Womack and he heard the bell on the wigwag at the crossing although he did not look at the wigwag. Beverly Snodgrass, who was inside a house a short distance north of the crossing, testified that she heard the train whistle but did not see the train prior to the collision.

The locomotive engineer and fireman had both died prior to the trial and their testimony was not available. Members of the train crew put their speed at 60 miles per hour before they saw Lucas' truck on the tracks. Keith Rickman, the train conductor, testified that there was "excessive" blowing of the whistle at about the time the caboose was at the French Road crossing, about one-quarter mile north of the Mathews Road. About five seconds after the "excessive" blowing of the whistle started, the train went into emergency.

Brakeman David Cannon testified that the other brakeman (Mr. Fischer, who was sitting on the opposite side of the caboose) said there was a truck on the track. There was a blast of the whistle and the air went into the emergency brakes. Fischer testified that the engineer was blowing the whistle excessively long; that the emergency brakes were on shortly after the whistle started; that the whistling started approximately a quarter-mile from the Mathews Road crossing. In the meantime he had looked out the window of the caboose and saw the truck on the track ahead of the train.

### No Contributory Negligence as a Matter of Law

 Defendant contends that there is no substantial evidence to support the verdict exonerating Lucas of contributory negligence; to the contrary, that he was guilty of contributory negligence as a matter of law.
 Where the evidence on the issue of contributory negligence is conflicting and would support a finding either way, the question is one of fact and not of law and must be decided by the jury; contributory negligence is

not established as a matter of law " 'unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other . . . .' " (*Hogue* v. *Southern Pacific Co.,* 1 Cal.3d 253, 259 [81 Cal.Rptr. 765, 460 P.2d 965].) ▇ It is also said that in reviewing sufficiency of the evidence on the issue of negligence, the power of the appellate court begins and ends with the inquiry whether there is any substantial evidence to support the jury's finding. (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183].)

▇ Much of the evidence on the contributory negligence issue was in sharp conflict. According to plaintiff's witnesses, the wigwag signal did not commence operating and the train whistle did not commence blowing until Lucas' truck was on the westerly tracks. Defendants' evidence is to the contrary. Questions of conflict and credibility were for the jury. In finding negligence on the railroad's part, the jury impliedly found that the wigwag signal and train whistle did not provide Lucas with warning of the approaching train. This implied finding, made upon conflicting evidence, must be accepted as an established fact upon appeal.

▇ Nevertheless, defendant contends in effect that physical facts compel the conclusion that the stack of boxes to Lucas' left did not obstruct his northward view of the tracks as he drove up the grade toward the crossing; that in fact he had an unobstructed view 2,000 feet to the north of the crossing; that the accident could only have happened through his failure to look before he drove onto the tracks.

Both Mrs. DeLong and Mrs. Tomlin testified that the stack of boxes formed an obstruction to the northward vision of a vehicle driver approaching the tracks from the west. Officer DeSelms, the investigating highway patrolman, testified to the same effect. Both Mrs. Tomlin and Mrs. DeLong stated that, as they sat in their automobile behind Lucas' truck, the railroad train did not come into their view until it passed the corner of the box stack. Neither Mrs. Tomlin nor Officer DeSelms described the point at which a driver, moving up the grade toward the west pair of tracks, would gain an unobstructed view northward up the tracks. Only Mrs. DeLong purported to do so.

An important problem was not whether the boxes presented some obstruction to the driver's vision, but whether he would move past the obstruction in time to get an unrestricted view of the tracks, see an approaching train and stop before moving onto the tracks. At this point, plaintiffs rely solely and completely upon the testimony of Mrs. DeLong, who de-

clared that the stack of boxes obstructed a driver's northward vision until the driver was almost on the westerly pair of tracks.[1]

Mrs. DeLong's testimony describing the range of the driver's northward view is completely belied by undisputed physical facts. Neither side questions the accuracy of the diagrammatic representation in evidence. It demonstrates that the stack of boxes was 32 feet distant from the mainline track on which the fatal train was traveling.[2] Between the easterly edge of the box stack and the westerly mainline track was a corridor of unobstructed vision 32 feet wide. A vehicle driver moving easterly on Mathews Road up the incline toward the crossing, gained a clear northward view of the tracks as soon as his eye entered that 32-foot corridor. Within that 32-foot corridor his vision was limited only by the horizon or by atmospheric conditions. The day of the accident was clear.

There is in evidence a photograph taken two days after the accident. It presents a view northward from Mathews Road, taken from a point some-

---

[1]We quote portions of Mrs. DeLong's direct examination:

"Q. And you have told us that the truck had been up on the tracks, and you saw the train, and at the time you saw the train the wigwag started operating?
A. Yes.
Q. Where was the train when you were able to see the train?
A. At the boxes down from the railroad crossing.
Q. As you went up the grade, were you able to see as far north as the eye can normally see?
A. No.
Q. Why couldn't you see?
A. There was the obstruction of the boxes.
Q. Do you know what type of boxes these were?
A. I believe they were carrying tomatoes, they were the wooden boxes.
Q. Do you know how high they were?
A. Rather high, I couldn't estimate exactly. As the train came down, I would say they were almost as high as the train.
Q. When you first saw the train, was the train nearer to you or farther to you from the boxes?
A. It was right next to the boxes, just as the nose comes past the boxes where I seen it.
" . . . . . . . . . . .
Q. Did you see the collision?
A. Yes.
Q. And can you describe what you saw?
A. Yes. The train hit the cab of the truck throwing the door on the passenger side off onto the ground by the railroad tracks and sent the man out that door.
" . . . . . . . . . . .
Q. And, Mrs. DeLong, have you ever traveled east along Mathews where you attempted to look up the tracks to the north?
A. Yes.
Q. And how close to the tracks would you have to come before you could see past the boxes?
A. My car would be almost setting on the first tracks, and I would be looking out over the steering wheel to look down."

[2]A pair of railroad sidings ran parallel to the mainline tracks (between those tracks and the box stack), but rejoined the tracks before the Mathews Road crossing.

what west of the tracks. The record is deficient at this point. Beyond establishing that the camera was at the eye level of a pedestrian, the record does not designate the distance between the camera and the tracks. The pavement of Mathews Road occupies the lower half of the picture, permitting the inference that the cameraman was standing at or near its south edge. A pair of white-painted limit lines appear in the right foreground. These limit lines cross the eastbound lane of Mathews Road between the cameraman's apparent position and the tracks. On the diagram in evidence, these limit lines are 10 feet west of and parallel to the west pair of tracks. The photograph shows an unobstructed view of the tracks northward past the stack of boxes and past the packing shed. That unobstructed view is close to the center of the photograph and cannot be the product of a wide-angle lens. Because of distortions inherent in photographic observations and because the trial record does not adequately establish the camera's position and field, the photograph would not alone form a reliable basis for appraising Mrs. DeLong's testimony. Viewed in company with the scale diagram, it offers substantial reinforcement of the conviction produced by the latter, that is, that a 32-foot corridor of unobstructed vision was available for a driver as he moved toward the west pair of tracks. Mrs. DeLong's testimony that a car would have to be "almost setting" on the tracks before the driver could see past the boxes is sheer error, sheerly incredible.

Moreover, Mrs. DeLong's testimony was in other respects demolished by the physical facts. She had testified that she first saw the train as the nose of the engine emerged past the stack of boxes. Her own distance from the track at that point of time was important. Lucas had by that time moved through the 32-foot corridor of unobstructed vision. If Mrs. DeLong had been within that same corridor, she would have had a relatively unobstructed view of the tracks to the north. If, as she testified, she first saw the nose of the train emerge past the stack of boxes, her point of view was located somewhere west of the 32-foot corridor.

The truck-trailer combination had an over-all length of 60 feet. At 22 inches and also at 6 feet east of the west tracks, Patrolman DeSelms found the marks of lateral tire movements in the pavement, caused by the sideways movement of the truck-tractor as it was impelled by the force of the locomotive. Both Patrolman DeSelms and Mrs. DeLong testified that the railroad engine hit the truck cab. At the moment of impact, then, the rear of the 60-foot truck rig was located between 40 and 50 feet west of the tracks. Mrs. DeLong had placed her own automobile 10 feet behind the truck. Yet, in placing on the diagram her own position at the moment of impact, she marked a position only 28 feet from the rails. In view of the grain truck's position at the time of the impact, Mrs. DeLong placed herself squarely on top of Lucas' grain trailers. Obviously, her automobile

and the grain trailers could not simultaneously occupy the same physical space. The undisputed evidence as to the length and position of Lucas' truck at the moment of impact signified that Mrs. DeLong was not 28 feet from the tracks at that point in time, but rather 50 to 60 feet. She was at no time within 50 feet of Lucas' advance across the tracks. Her view of the approaching train was not his. Lucas' point of observation was 60 or more feet ahead of Mrs. DeLong's throughout the sequence of events.

Even allowing for Mrs. DeLong's testimony that she had followed Lucas' truck to a point closer to the tracks and herself had backed up as he put his truck into reverse, the physical facts compel the conclusion that, when Mrs. DeLong saw the nose of the locomotive emerge into her field of vision, she was not within the 32-foot corridor of unobstructed vision adjoining the west tracks. No matter what Mrs. DeLong believed and stated, the physical evidence inexorably attests that Lucas had 32 feet within which to see the train and stop. At a speed of five miles per hour he could have stopped his truck had he looked and seen.

■ Substantial evidence " 'must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with "any" evidence. It must be reasonable in nature, credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.' " (*People* v. *Bassett,* 69 Cal.2d 122, 139 [70 Cal.Rptr. 193, 443 P.2d 777], quoting from *Estate of Teed,* 112 Cal.App.2d 638, 644 [247 P.2d 54].) ■ Even though a jury had accepted a witness' testimony, an appellate court may and should reject it if its truth is a physical impossibility. (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758]; *Postier* v. *Landau,* 121 Cal.App.2d 98, 101 [262 P.2d 565].) ■ Mrs. DeLong's testimony supplied no reasonable or credible evidence, no basis for the hypothesis that Lucas was unable to see the oncoming train during the 32 feet of his journey just before he reached the west tracks. ■ An appellate court need accept only the reasonable inferences of the jury. "The trier of the facts may not believe impossibilities." (*Hicks* v. *Reis,* 21 Cal.2d 654, 660 [134 P.2d 788].)

■ Because the driver had an adequate range of vision to see the approaching train during the last part of his journey towards the tracks, review of the contributory negligence issue is close, difficult and delicate. No one could quarrel with a jury verdict finding that Lucas had been contributorily negligent. Whether an appellate court may set aside a contrary verdict is another matter. Rejection of the only eyewitness testimony supporting the verdict does not permit reversal if there is any other reasonable hypothesis for the conclusion that Lucas exercised ordinary care for his own safety.

Defendant's contributory negligence contention is hinged to the assumption that a driver at a railroad crossing is guilty of contributory negligence as a matter of law if he has an opportunity to look for a train and fails to look or fails to see. The assumption is supported by a number of opinions of California appellate courts. Some of these opinions declare that a railroad track is itself a warning of danger, that a driver intending to cross must avail himself of every opportunity to look and listen; if there are obstructions to his view, he is required to take greater care. (*Will* v. *Southern Pacific Co.,* 18 Cal.2d 468, 474 [116 P.2d 44]; *Balding* v. *Atchison, T. & S. F. Ry. Co.,* 225 Cal.App.2d 254, 259-260 [37 Cal.Rptr. 215]; *Wilkinson* v. *Southern Pacific Co.,* 224 Cal.App.2d 478, 488 [36 Cal.Rptr. 689].) Others state categorically that a driver must look for trains when approaching the track. (*Green* v. *Key System Transit Lines,* 116 Cal.App.2d 512, 519 [253 P.2d 780]; *Lazzarotto* v. *Atchison, T. & S. F. Ry. Co.,* 157 Cal.App.2d 455, 461 [321 P.2d 29].) Some say that the railroad's violation of its duty to give warning signals does not absolve the driver from his duty to look and listen and, if his vision is obstructed, even to stop. (*Wilkinson* v. *Southern Pacific Co., supra,* 224 Cal.App.2d at p. 489, citing *Hutson* v. *Southern Cal. Ry. Co.,* 150 Cal. 701, 703 [89 P. 1093].) Others qualify the latter proposition, opining that the driver will be held to a lesser "quantum" of care if the railroad has equipped the crossing with signals which fail to operate. (*Startup* v. *Pacific Electric Ry. Co.,* 29 Cal.2d 866, 871 [180 P.2d 896]; *Toschi* v. *Christian,* 24 Cal.2d 354, 360 [149 P.2d 848]; *Pennington* v. *Southern Pac. Co.,* 146 Cal.App.2d 605, 615 [304 P.2d 22].)

Appellate declarations of this sort call for cautious handling. ■ The duty of one charged with negligence or contributory negligence is to exercise reasonable care under the circumstances. (Civ. Code, § 1714; *Rowland* v. *Christian,* 69 Cal.2d 108, 111-112 [70 Cal.Rptr. 97, 443 P.2d 561]; *Warner* v. *Santa Catalina Island Co.,* 44 Cal.2d 310, 317 [282 P.2d 12]; Prosser on Torts (3d ed.) pp. 153, 207.) Aside from those rare cases where dispute is impossible, the jury, not the appellate court, decides whether the actor has exercised reasonable care under the circumstances. (*Warner* v. *Santa Catalina Island Co., supra,* 44 Cal.2d at p. 318; *Mosley* v. *Arden Farms Co.,* 26 Cal.2d 213, 217 [157 P.2d 372]; Rest. Torts 2d §§ 328B, 328C.) ■ Appellate edicts fixing the conduct of reasonably careful drivers at railroad crossings infringe on the jury's power to decide what amounts to reasonable care. They propound as relatively immutable "rules" or declarations of "duty" those choices which juries make on a case-by-case basis.[3]

---

[3]The tendency of judicial opinion writers to classify crystallized specimens of conduct as care or negligence under particular circumstances is described in Weiner, *The Civil Jury Trial and the Law-Fact Distinction,* 54 Cal.L.Rev. 1867, 1883-1885.

Even Justice Holmes succumbed to the temptation to paint an *ad hominem* appraisal of conduct at a railroad crossing as an ineluctable demand of law. He declared that if discovery of a train's approach necessitated it, a truck driver had to "get out of his vehicle" before attempting to cross the rails. (*Baltimore & Ohio R.R. Co.* v. *Goodman,* 275 U.S. 66, 70 [72 L.Ed. 167, 48 S.Ct. 24, 56 A.L.R. 645].) Later, in *Pokora* v. *Wabash Ry. Co.,* 292 U.S. 98 [78 L.Ed. 1149, 54 S.Ct. 580, 91 A.L.R. 1049], the federal Supreme Court repudiated the Holmes formulation. In *Pokora,* Justice Cardozo spoke for a unanimous court, observing: "Standards of prudent conduct are declared at times by courts, but they are taken over from the facts of life. . . . [There is] need for caution in framing standards of behavior that amount to rules of law. . . . [W]hat is suitable for the traveler caught in a mesh where the ordinary safeguards fail him is for the judgment of a jury." (*Ibid.* at pp. 104-106 [78 L.Ed. at pp. 1154-1155].)

The semi-spurious character of these "rules" was exposed by Justice Schauer in *Toschi* v. *Christian, supra,* 24 Cal.2d at page 360. He pointed out that the extent to which a traveler may rely upon the expected operation of railway warning devices "cannot be precisely defined as a pure proposition of law applicable to all the circumstances. . . . Standards of care are typically relative; rules of law are basically absolute. Hence, in regard to negligence, any attempt to screen factual conduct into legal classifications through a sieve of absolute law will be impracticable whenever the related circumstances admit of materially conflicting inferences. In other words, the actor's conduct must always be gauged in relation to all the other material circumstances surrounding it and if such other circumstances admit of a reasonable doubt as to whether such questioned conduct falls within or without the bounds of ordinary care then such doubt must be resolved as a matter of fact rather than of law."

Similarly, in *Anello* v. *Southern Pacific Co.,* 174 Cal.App.2d 317, 320 [344 P.2d 843], Justice Stone points out that jury instructions of the stop, look and listen variety are open to criticism as "the crystallization of a question of fact which the jury should determine into a rule of law which the jury must follow."

Whether these declarations of care are law or only excrescences on the law, they become enshrined in jury instructions and formally declared as the manifest law governing the jury's decision. (See, e.g., BAJI 6.40 to 6.43, inclusive.) In a sense such instructions trespass upon the jury's power to decide whether the actor's conduct conforms to the standard of reasonable care. They do supply the jury with helpful, practical guidance, for they represent the distillation of much human experience. Given the conditions

and qualifications incorporated in these instructions and given any uncertainty in the facts or any choice of inferences, the jury may bring in a verdict for either side of the lawsuit with fairly solid assurance that a reviewing court will not supplant its action.

Whittled down to their true scope and size, these appellate edicts of care are tolerable guides for juries. Magnified into general propositions of law, they incite judicial usurpation of the jury. A trial judge is rash when he nonsuits an injured driver, convicting him of contributory negligence for violating one of these standards. (See, e.g., *Toschi* v. *Christian, supra.*) An appellate court similarly oversteps its role when it fastens the violating driver with contributory negligence as a matter of law. ▮ Here, we are convinced that Lucas had 32 feet of unobstructed vision; that he did not look or, if he did, that he did not see. ▮ Despite appellate edicts that a driver must invariably look, he cannot be convicted of contributory negligence as a matter of law if any rational hypothesis of care sustains the jury's finding of care.

The essence of the matter is this—that the driver's view is somewhat obstructed does not make him contributorily negligent as a matter of law; whether his failure to stop, the place from which he looks and the character and extent of the obstruction to his view are such that a reasonably prudent person would not have so conducted himself are questions for the jury in determining whether he was guilty of contributory negligence. (*Marquis* v. *St. Louis-San Francisco Ry. Co.*, 234 Cal.App.2d 335, 348-349 [44 Cal. Rptr. 367]; *Wilkinson* v. *Southern Pacific Co., supra*, 224 Cal.App.2d at pp. 488-489; *Green* v. *Key System Transit Lines, supra*, 116 Cal.App.2d at p. 519.) Whether the determination is one of fact, as the majority of the California Supreme Court have held, or one of law, as a minority have asserted, it is still a jury function and a jury question. (Compare majority and concurring opinions in *Toschi* v. *Christian, supra*, and *Mosley* v. *Arden Farms Co., supra.*)

▮ In finding defendant railroad negligent, the jury impliedly found that neither the wigwag nor whistle had come into operation before Lucas drove onto the tracks. That finding, made upon conflicting evidence, is binding on appeal. Although Lucas had driven the grain truck for only two days before his accident, a fellow driver testified that the grain company employing him was located a quarter-mile south of the Mathews Road crossing, and the crossing was a "designated route" for the grain trucks. The jury could reasonably believe that Lucas was familiar with the crossing; that he expected the wigwag and whistle to warn him of approaching trains; that he was lulled into a sense of security by the nonoperation of these signals; that under the circumstances he exercised reasonable care for his

own safety.[4] Because a reasonable hypothesis is available to support the jury's finding, Lucas was not contributorily negligent as a matter of law.

*Jury Instructions*

Defendant makes a series of attacks on the jury instructions. Most of these attacks view a selected instruction in isolation, ignoring the principle that instructions are to be read and construed together.

■ On the subject of contributory negligence defendant requested both BAJI 103.1 (Rev.) and 103.3 (Rev.). It charges error in rejection of the former, complaining that the latter instruction declares the effect of contributory negligence but does not define it. The argument has some force[5] but the claim of error fails. The trial court gave a series of instructions which defined negligence, made parallel references to negligence and contributory negligence and described the care expected of an automotive driver at a grade crossing. When the instructions are viewed in composite, they distinctly told the jury not only that contributory negligence meant negligence on the part of Raymond Lucas, but also that plaintiffs could not recover if Raymond Lucas had been guilty of contributory negligence proximately causing the accident.

■ On its own motion the trial court gave the jury a somewhat altered version of BAJI 149 (Rev.) dealing with the negligence per se effect of a violation of the Vehicle Code provision regulating the conduct of a driver when a railroad warning signal is in operation.[6] Defendant complains of that part of the instruction dealing with justification or excuse for statutory violation, claiming lack of evidentiary support for the doctrine of excused violation. (*Alarid* v. *Vanier*, 50 Cal.2d 617, 624 [327 P.2d 897]; *Tannyhill* v. *Pacific Motor Trans. Co.*, 227 Cal.App.2d 512, 516 [38 Cal.Rptr. 774].)

[4]Quite aside from limitations on the judicial role, appellate judges have found reasonableness under comparable circumstances. Thus in *Startup* v. *Pacific Electric Ry. Co.* the majority opinion of Chief Justice Gibson observes that even where the driver failed to look, the jury could consider justifying circumstances. Although not joining the majority opinion, Justice Traynor agreed, stating: "In my opinion the invitation to cross implicit in the cessation of the wigwag and the absence of other factors that might serve to warn of danger relieved the driver of the duty to look for approaching trains." (29 Cal.2d at p. 872.)

[5]In the subsequently published (1969) edition of BAJI, the basic instruction on contributory negligence in death cases has been redrafted to define contributory negligence as well as to declare its effect, thus paralleling more closely that given in personal injury actions. (See BAJI (1969) 3.50, 3.53.)

[6]The instruction in question declared: "If you find that the deceased, Raymond Lucas violated Vehicle Code Section 22451(a), the statute just read to you and that such violation was a proximate cause of his death, you will find that such violation was negligence unless the plaintiffs prove by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law."

Contrary to defendant's assumption, evidentiary support exists. Several witnesses testified that no bell or whistle sounded prior to the time Lucas drove onto the tracks. Other testimony left questions as to how long before the collision the wigwag was operating and the train whistle sounding. Which warnings were in operation and the time length of the warnings were jury questions. If, as the jury might find, the wigwag started to operate very late, or if the wigwag operated but the train whistle did not, there existed a substantial question of excusable or justified violation of the Vehicle Code provision.

 Defendant charges lack of even-handedness in the court's instructions on the respective statutory duties of the parties to the accident. Thus the court instructed that a violation of the Vehicle Code by the driver had to be a proximate cause of the accident (see fn. 6, *ante*). Yet, in instructing on a failure by the railroad to sound the whistle, the court simply equated the latter failure with negligence without setting forth the demand for a finding of proximate causation. Here too defendant takes a piecemeal view of the instructions. The jury received the standard instruction on the plaintiffs' burden of proof, including the demand that the defendant's negligence be a proximate cause of the death. To charge that the instructions gave the jury an opportunity or invitation to ignore proximate causation is to ignore the obvious.

The trial court did err in its formulation of BAJI 149 (fn. 6, *ante*) because the court's version told the jury, in effect, that in order to find Lucas negligent, it had to find two elements: (1) that decedent violated the Vehicle Code section and (2) that such violation was a proximate cause of the accident. Of course proximate cause is an element separate from negligence and is not a factor in or a precondition of negligence. The error was harmless.

 In instructing the jury on Public Utilities Code section 7604 (requiring the sounding of a bell or whistle at crossing approaches), the court omitted the usual language on justification or excuse for statutory violation. Defendant charges that the omission was error. To the contrary, the court would have erred by including that language, for there was no evidence to support it. (*Wilkinson* v. *Southern Pacific Co., supra,* 224 Cal. App.2d at pp. 481-482; *Elm* v. *McKee,* 139 Cal.App.2d 353, 359 [293 P.2d 827].)

 Isolating this same instruction from all others, defendant complains because the court did not tell the jury that a violation of section 7604 was inconsequential unless it proximately caused the accident. Isolated deficiency in an instruction does not cause reversal so long as the body of the instructions states the case fully and fairly. (*Waller* v.

*Southern Pacific Co.,* 66 Cal.2d 201, 213 [57 Cal.Rptr. 353, 424 P.2d 937].) ■ The jury were fully and fairly instructed on the necessity for finding proximate cause.

■ In giving the jury BAJI 203 (duty of driver crossing tracks), the court eliminated the second paragraph of that instruction, which tells the jury that a train crew's failure to sound bell or whistle does not excuse a driver from using ordinary care for his own safety. No error occurred. The subject matter of the eliminated paragraph was fully covered by BAJI 203-C[7] and by BAJI 151, the basic instruction on the duty of a vehicle driver.

■ Defendant complains of the rejection of BAJI 140 (looking and not seeing). As pointed out in *Hom* v. *Clark,* 221 Cal.App.2d 622, 646-647 [35 Cal.Rptr. 11], this instruction is argumentative and only repeats a commonplace. The court properly rejected it, for it would have distracted the jury from the main issue of the case.

■ The court properly rejected defendant's request to give BAJI 203-I.1 (assumption of normal faculties) for its subject matter was fully covered by BAJI 148.2 (right to assume the good conduct of others). ■ Defendant's claim of error in the court's rejection of a contributory negligence instruction (modeled upon BAJI 113.2) is negated by the fact that the subject matter was fully covered by the combined effect of BAJI 21 and BAJI 103.3 (Rev.), both of which were given at defendant's request.

### Propriety of Damage Award

■ Raymond Lucas was 25 years old at the time of his death. His surviving family consist of his widow and three children of the ages of 7, 6 and 3. He had a life expectancy of 44 years and annual income expectations up to $9,400 per year. The jury brought in an award slightly in excess of $226,000. Defendant attacks the award as excessive, indicative of jury passion or prejudice. It argues that the jury fixed a sum whose investment would provide an annual income equal to the decedent's earnings without diminishing the principal; that, to the contrary, the jury was instructed to calculate the present value of future earnings; that the jury failed to deduct the decedent's personal expenses from the income which would have been available for his family.

Defendant's contention is patently ill-founded. Wrongful death benefits

---

[7]At this point the jury were told: "No failure in the operation of a mechanical device placed at a crossing to signal warning, absolves a person going upon a track area such as that involved in this case from the duty to exercise ordinary care for his own protection, and to that end, looking and listening for the approach of train, engine or car."

may include an amount designed to compensate the family for the loss of the comfort, protection and society provided by the deceased husband and father. (*Gilmore* v. *Los Angeles Ry. Corp.*, 211 Cal. 192, 200 [295 P. 41]; *Syah* v. *Johnson*, 247 Cal.App.2d 534, 547 [55 Cal.Rptr. 741].) Defendant's attack on the verdict ignores this element of damage.

Judgment affirmed.

Regan, J., and Janes, J., concurred.

A petition for a rehearing was denied August 30, 1971, and appellants' petition for a hearing by the Supreme Court was denied September 30, 1971.